James N. CONSTANT

v.

The UNITED STATES.

No. 406–78.

United States Claims Court.

Oct. 19, 1982.

 

Irvin A. Lavine, Washington, D.C., for plaintiff; Norman Zafman and Ira M. Siegel, Beverly Hills, Cal., of counsel.

William O. Geny, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Vito J. DiPietro, Washington, D.C., of counsel.

## OPINION

SETO, Judge:

The plaintiff in this action, James N. Constant, seeks compensation for certain damages allegedly caused by the imposition of a secrecy order under 35 U.S.C. § 181.[1] The secrecy order in question was imposed during the prosecution of plaintiff's U.S. patent application Serial No. 870,598. During the 15-month period in which the order was in effect, plaintiff was not permitted to disclose the details of his invention to certain classes of persons. Following rescission of the secrecy order, plaintiff's application, titled "System for Identifying Objects Using an Encoding Array for Each Object," issued as U.S. Patent No. 3,691,557 (the '557 patent).

The '557 patent teaches the combination of a synthetic aperture radar and an object label consisting of a binary-coded dipole array. In an embodiment of the invention directed to the task of automatic vehicle identification (AVI), the coded dipole label is affixed to the vehicle to be identified. As the vehicle and label move in an azimuthal direction relative to the radar, the dipole array is scanned by the radar, producing a reflected sequence of pulses which can be detected and decoded to provide vehicle identification information.

In accordance with 35 U.S.C. § 181, the Commissioner of Patents and Trademarks is

---

1. Chapter 17 of the Patent Act of 1952, 66 Stat. 805, 35 U.S.C. §§ 181, *et seq.*, is frequently referred to as the Invention Secrecy Act.

authorized, upon the recommendation of a specified federal agency, to withhold the grant of a patent and to order that an invention be kept secret in the interest of national security. 35 U.S.C. § 183 provides a remedy for a patent owner affected by a secrecy order. This section provides, *inter alia*, that the owner of a patent which has been issued upon an application that was subject to a secrecy order may " * * * * bring suit in the Court of Claims[2] for just compensation for damage caused by the order of secrecy * * *." 35 U.S.C. § 183; *Constant v. United States*, 223 Ct.Cl. 148, 617 F.2d 239 (1980).

Plaintiff filed the subject patent application Serial No. 870,598 on September 22, 1969. The secrecy order was imposed on May 18, 1970, as a result of the recommendation of the Armed Services Patent Advisory Board. On August 27, 1971, following petition and appeal,[3] the secrecy order was rescinded. On December 10, 1971, a notice of allowance was mailed to plaintiff, and the '557 patent issued on September 12, 1972.

On September 11, 1978, plaintiff filed suit in the Court of Claims pursuant to 35 U.S.C. § 183. On February 2, 1979, defendant moved for summary judgment, contending that the Court of Claims lacked jurisdiction to award damages where the issuance of a patent had not been delayed by the imposition of a secrecy order. On March 19, 1980, the court denied defendant's motion, noted jurisdiction, and remanded the case for trial.

As an aside, the court addressed the quantum of proof required for recovery under the statute. On the basis of the legislative history, the court noted:

> We think the consensus at the hearings was that neither the courts nor the administrative agencies would permit purely speculative damages, but that there would have to be "real concrete evidence of damage," * * *, "actual damages" * * *,

proven damages * * *, or "perhaps a greater degree of proof or ability to prove damages." That general expectation and admonition should, of course, be respected. *Constant, supra,* 223 Ct.Cl. at 159, 617 F.2d at 244. [*See Hearings on H.R. 4687 before Subcommittee No. 3, Committee on the Judiciary,* 82d Cong., 1st Sess. 17, 18, 21, 22, 23, 28, 32 (1951).]

According to plaintiff's theory of the case, the time period during which the secrecy order was in force was a critical time in the development of AVI systems. Since plaintiff was precluded from disclosing the details of his invention to potential licensees, purchasers, or sources of financing for his invention, plaintiff asserts that he was placed at a competitive disadvantage relative to other developers of AVI systems. By the time the order was rescinded, plaintiff contends that the opportunity for an entrepreneur to enter the AVI market had vanished, due to the entry of major corporations with sufficient resources to overwhelm competitors with limited funding.

Plaintiff seeks damages in five general categories: (1) profits lost as a result of interference with business opportunities; (2) expenses incurred in attempts to obtain rescission of the secrecy order; (3) out-of-pocket business losses; (4) damages for interference with plaintiff's right to compete in the AVI market; and (5) damages resulting from delays in filing foreign patent applications.

Trial was held in Los Angeles, California, between October 15 and 21, 1981. Plaintiff testified as the only witness. At the conclusion of plaintiff's case-in-chief, defendant moved to dismiss the case under Rule 102(c),[4] on the basis that plaintiff had failed to demonstrate a right to recovery as a matter of law. Following a review of the memoranda submitted in support of and in opposition to defendant's motion, defendant's motion was allowed on February 24, 1982.

---

**2.** Now the U.S. Claims Court, *see* Pub.L. No. 97–164, 96 Stat. 25 (Apr. 2, 1982).

**3.** *See* 35 U.S.C. § 181; 37 C.F.R. §§ 5.4, 5.8.

**4.** *See* old Court of Claims Rule 102(c), now superseded by new Court of Claims Rule 41(b).

■ In considering defendant's motion to dismiss on the ground of insufficiency of evidence, the court may evaluate plaintiff's evidence in the same manner as if both parties had presented their cases and rested. The court may draw such inferences as the evidence and logic will permit, but must dismiss plaintiff's petition if plaintiff has failed to demonstrate any right to recovery. *See Howard Industries, Inc. v. United States,* 126 Ct.Cl. 283, 115 F.Supp. 481 (1953).

Court of Claims Rule 102(c) finds its counterpart in Rule 41(b) of the Federal Rules of Civil Procedure. Applying Rule 41(b), one court noted:

> The court as the trier of fact in a non-jury action is not required to give any special preference to plaintiff's evidence on the motion to dismiss at the close of plaintiff's case. Rather, the court on a Rule 41(b) motion shall make an unbiased consideration of all the evidence, direct and circumstantial, and accord the evidence such weight as the court believes the evidence deserves. *Havelick v. Julius Wiles Sons & Co., Inc.,* 445 F.Supp. 919, 925 (S.D.N.Y.1978). [*See also, Woods v. North American Rockwell Corp.,* 480 F.2d 644 (10th Cir.1973); *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668 (9th Cir.1975); *Moore's Federal Practice* ¶ 41.13[3] ].

## I. Background

James N. Constant is an acknowledged expert in the field of radar technology, with numerous U.S. patents and other technical publications to his credit. Although the majority of Mr. Constant's professional work has been devoted to military applications of radar technology, Mr. Constant conceived a unique application for a technology known as synthetic aperture radar in the late 1960's. In this concept, the radar transmitter scanned a dipole array which could be coded to uniquely identify the object to which the dipole array was affixed. Such a system might be used as part of an automatic identification system for moving vehicles, shipping containers, packages, or components moving along an assembly line.

Among the possible AVI applications foreseen by Mr. Constant were AVI systems for railroad rolling stock, trucks, buses, automobiles, and the large shipping containers employed by containerized ocean-shipping lines. A particular advantage of a system based upon microwave reflection and detection, such as that contemplated by the '557 patent, is the relative immunity of such a system to the interference caused by dust, dirt, precipitation, smoke, or other environmental conditions which tend to obscure labels designed to be scanned optically.

Mr. Constant reduced the '557 invention to practice on September 22, 1969, by filing a patent application. On May 18, 1970, a secrecy order was imposed against the contents of the patent application, following a review of the application by the Armed Services Patent Advisory Board. This was an unexpected development from Mr. Constant's point of view, since Mr. Constant was aware that synthetic aperture radar technology had been declassified prior to the filing of the patent application.

The secrecy order forbade disclosure of the contents of the '557 patent application, or any material information relating to the invention, to any person not cognizant of the invention prior to the date the secrecy order was imposed. The conceivable penalties for failure to abide by the terms of a secrecy order are severe, and may include forfeiture of all patent rights, fines, and imprisonment.[5]

A disclosure permit, designated "Permit A," accompanied the order. This permit authorized the disclosure of the '557 invention to the following classes of persons:

(a) Any officer or employee of any department, independent agency, or bureau of the Government of the United States; or

(b) Any person authorized specifically by the head of any department, independent agency, or bureau of the Govern-

---

5. *See* 35 U.S.C. §§ 182, 185, 186.

ment of the United States, or by his duly authorized subordinate, as a proper individual to receive the disclosure of the above indicated application.

On May 23, 1970, plaintiff filed a petition with the Commissioner of Patents requesting the immediate rescission of the secrecy order. However, no action was apparently taken on this request until April 15, 1971, when plaintiff was informed that his petition had been denied.

As a result of a subsequent request by plaintiff, a permit was issued on April 26, 1971, authorizing plaintiff to disclose the contents of the application to legal counsel. On June 8, 1971, plaintiff, by counsel, appealed the denial of his petition for rescission of the secrecy order to the Secretary of Commerce. On August 27, 1971, the secrecy order was rescinded, and prosecution of the '557 patent application was continued. On September 12, 1972, the '557 patent issued.

As a vehicle for the commercial exploitation of his inventions, Mr. Constant established RCS Associates, Inc. (RCS) in 1967. Mr. Constant continues to be the sole owner of the stock of RCS, which was incorporated in California in 1968. The principal business office for RCS is located in Mr. Constant's home in Claremont, California.

After the filing of the '557 patent application, plaintiff initiated several efforts directed to developing and commercializing plaintiff's AVI concepts. These efforts may be grouped into three areas. First, plaintiff contacted banks and the Small Business Administration, seeking to finance the operating expenses of RCS Associates during the development of a prototype of the '557 invention. Second, plaintiff investigated suppliers of electronic components and companies capable of manufacturing AVI systems under subcontract. Third, plaintiff mailed a number of unsolicited proposals to parties who, in plaintiff's estimation, appeared to be logical potential users of commercial embodiments of the '557 invention.

Plaintiff's search for financing for RCS consisted of writing letters to the Small Business Administration (SBA), Bank of America, and Inland Bank. Plaintiff has alleged that the imposition of the secrecy order "thwarted" these attempts to obtain bank loans. However, the record does not support this contention.

On September 25, 1970, plaintiff mailed a "business plan" to Bank of America, requesting a loan under the SBA 90-percent loan guarantee program, of $75,000, with a disbursement schedule of $25,000 per month, for 3 months. The business plan described RCS Associates, plaintiff's AVI concepts, and other lines of business envisioned by plaintiff. As security for the loan, RCS offered an "assignment of customer contract." The business plan stated that this "customer contract," which allegedly involved a feasibility study for the National Aeronautics and Space Administration, was to be awarded on October 15, 1970. However, this "contract" was, in fact, never awarded; neither were the other "proposed contracts" described in the business plan. In any event, on September 29, 1970, 4 days after plaintiff submitted his "business plan," an officer of the Bank of America branch in Claremont, California, declined plaintiff's request for financing, without mentioning the secrecy order.

On September 30, 1970, plaintiff filed his "business plan" with Inland Bank in Claremont, California. On October 19, 1970, Otto B. Christian, Vice President of the bank, informed plaintiff by letter that his request for financing had been declined. Again, no mention was made of the secrecy order. Moreover, Mr. Christian's letter indicates that plaintiff was unable to secure financing from Inland Bank for more fundamental business reasons. Mr. Christian informed plaintiff that, in his view, the RCS proposal amounted to a request for equity financing, which would not have been a proper use of bank funds.

Thus, the record does not support plaintiff's allegations that the secrecy order impeded his efforts to obtain financing for the development of the '557 invention. The

record does suggest, however, that both Inland Bank and Bank of America were unwilling to discuss the possibility of a business loan with a company without tangible assets, without a single contract, and without operating experience in each of the lines of business proposed in the RCS "business plan."

During the spring of 1970, plaintiff sought information from various suppliers of electronic components regarding the price of the parts needed to fabricate a prototype of the '557 invention. Plaintiff obtained tentative pricing information from several suppliers, but no investment in supplies or equipment took place prior to or during the period in which the secrecy order was in effect.

Also in the spring of 1970, plaintiff began a letter-writing campaign in which he mailed, on RCS letterhead, a number of unsolicited proposals describing plaintiff's AVI concept to various companies. Although plaintiff did not have a working prototype of the '557 invention, plaintiff proposed that RCS conduct studies of customer needs, to be followed by prototype development. Although a number of companies indicated initial interest, no contracts or offers of contracts resulted from this correspondence. While plaintiff informed these companies of the imposition of the secrecy order, no letter from any company cited the secrecy order as an element affecting their decision to do, or not do, business with RCS. In addition, plaintiff called no witnesses from any of these companies to corroborate his allegations that the secrecy order interfered with his efforts to sell or license technology embodying the '557 invention.

On March 14, 1970, plaintiff submitted an unsolicited proposal to the American Association of Railroads (AAR) in which he outlined a "feasibility study" of the application of the '557 invention to the task of automatically identifying railroad rolling stock. On May 23, 1970, plaintiff informed AAR by letter that the secrecy order had been entered. On May 29, 1970, AAR returned plaintiff's proposal, and informed plaintiff that AAR could not support the proposed feasibility study. Although the letter from AAR stated that the proposal was being returned due to the secrecy order, there is no evidence in the record, other than plaintiff's own testimony, which would suggest that AAR was prepared to fund plaintiff's proposal.

Plaintiff's own documentary evidence demonstrates that at the time plaintiff proposed his version of an AVI system for identification of rolling stock, the AAR and its constituent railroads were committed to the installation of an AVI system known as the Sylvania Optical Automatic Car Identification System, or ACI. This system had been adopted in 1967, and during 1970, virtually all United States railroads were engaged in the installation of the optical labels required by the Sylvania system. According to a later study, which was entered into evidence, 92 percent of the freight cars sampled in July 1971 had been labeled with the Sylvania ACI optical labels.

Plaintiff's testimony suggests that the '557 invention, as applied to the task of automatically identifying railroad cars, incorporates advantages not found in the Sylvania ACI system. However, it is apparent that the U.S. railroad industry did not constitute a ready market for plaintiff's invention during the period in which the secrecy order was in effect.

On April 10, 1970, plaintiff wrote to the Port of New York Authority, seeking the appropriate persons to whom a proposal for an AVI system, adapted to bus identification, could be forwarded. Eventually, plaintiff submitted a detailed proposal. On November 24, 1971, plaintiff was invited to participate in a demonstration of his AVI system during a series of tests of various automatic bus identification systems. However, plaintiff was unable to construct and demonstrate a prototype prior to the deadline of March 15, 1972, established by the Port of New York Authority.

During the spring and summer of 1970, plaintiff initiated contacts with representatives of a number of United States containerized shipping lines. These companies in-

cluded the Pacific Far East Line, American President Lines, Matson Lines, Sea-Land Service, Inc., and United States Lines. In each case plaintiff described the benefits which the '557 invention could provide in the context of automatic container identification, and briefly described the technical parameters of the '557 invention in a manner which did not disclose the information protected by the secrecy order. In the case of the Pacific Far East Line, plaintiff submitted a proposal for the construction of a prototype. However, no contracts or offers of contracts resulted from these discussions.

At trial, plaintiff testified that he believed that the secrecy order was a factor which impeded his ability to sell or license the '557 invention to the shipping lines. However, he did not elucidate the basis for this belief, nor present any corroborating evidence or testimony to substantiate this allegation.

In 1970, plaintiff also described the merits of the '557 invention in unsolicited proposals submitted to the Federal Highway Administration, the Federal Railroad Administration, and the Post Office Department. Each proposal set forth plans for feasibility studies directed to analyses of applications of the '557 invention to identify vehicles, railroad cars, or package or letter mail. Since these agencies were permissible recipients of the information protected by the secrecy order under "Permit A," the secrecy order did not affect the scope of disclosure in these cases. However, none of these agencies pursued plaintiff's proposals beyond the preliminary evaluation stage.

On July 30, 1970, plaintiff was invited to submit a proposal for an Automatic Vehicle Monitoring System to the Office of the Secretary of Transportation. Plaintiff responded with a technical and business proposal, which was submitted on August 17, 1970. However, on December 28, 1970, plaintiff was informed that his proposal had been rejected. The contracting officer informed plaintiff by letter that the agency review process had determined that plaintiff's system, as proposed, did not appear to be within "the zone of technical superiority being considered for further negotiation."

In the case of each of these agencies, plaintiff has alleged that the secrecy order was a factor which substantially impeded his efforts at developing the '557 invention and obtaining further funding for the construction of a prototype. However, other than plaintiff's *ipse dixit,* no evidence was presented which would corroborate or support these contentions.

In the time period between September 1971 and the first months of 1973, plaintiff constructed a physical prototype of the '557 invention. However, no evidence was adduced which would indicate that the system actually operated in accordance with the patent specification, or in accordance with the representations made by plaintiff to the various parties to whom unsolicited proposals were sent.

In 1973, the United States Army Mobility Equipment Research and Development Center issued a Request for Quotations, seeking bids for the development of a system for automatically identifying and monitoring containerized shipments of military equipment. Plaintiff submitted a proposal for consideration, which was subsequently rejected as nonresponsive, incomplete, and unacceptable under the terms of the Request for Quotations.

After 1973, no serious efforts were undertaken by plaintiff or by RCS to enter the automatic vehicle identification or monitoring markets, to the extent that they existed.

## II. Plaintiff's Claimed Damages

### 1. Interference with Business Opportunities

As compensation for the interference with plaintiff's attempts to commercialize the '557 invention during the period in which the secrecy order was in effect, plaintiff seeks an award of $165,523. Of this sum, plaintiff asserts that $105,023 would have been earned as profit as a result of the performance of studies which were the subject of unsolicited proposals submitted to Ametek, Inc., General Motors, the various

shipping lines, the Department of Transportation, and the Federal Railroad Administration. The remainder, plaintiff asserts, would have been earned as profit if plaintiff were able to capture a "reasonable part" of the market represented by the purchase of automatic vehicle identification systems by the Port of New York Authority.

These conjectural and speculative claims must be rejected *in toto*. Apart from plaintiff's own conclusory *ipse dixit* testimony, the record is devoid of any probative evidence tending to show that the companies alleged to be potential "customers" were interested in plaintiff's unsolicited proposals, or that the secrecy order interfered with plaintiff's attempts to sell his system to these various companies and agencies. In the case of Ametek, General Motors, and the shipping lines, the court could infer that these alleged "customers" were initially interested in plaintiff's invention, but beyond evidence of a preliminary exchange of correspondence, the record is silent. No witnesses from these companies were subpoenaed, nor did plaintiff offer any document which would suggest that these companies were prepared to accept plaintiff's services. Similarly, no letters or other documents were offered which would tend to show that the secrecy order was a factor leading to the rejection of plaintiff's proposals.

In the case of the Department of Transportation and the Federal Railroad Administration, the secrecy order did not impair plaintiff's ability to disclose the contents of the '557 patent application to these agencies. "Permit A" clearly authorized the disclosure of plaintiff's invention to agencies of the Federal Government.

In the case of the Port of New York Authority, the record demonstrates only that plaintiff was unable to demonstrate his invention prior to the deadline imposed by the PNYA. Although plaintiff asserts that the secrecy order was a cause of plaintiff's inability to construct a prototype prior to the deadline, the record does not provide any foundation for this assertion.

Plaintiff's evidence strongly suggests that factors other than the imposition of the secrecy order were responsible for plaintiff's failure to find buyers for the '557 invention. First, the record indicates that, apart from the purchase of the Sylvania ACI system by the railroads prior to the filing of the '557 patent application, no market for automatic vehicle identification systems has ever developed in this country. Although the railroads, the Port of New York Authority, and the Army have experimented with certain applications of automatic vehicle identification, these experiments took place either prior to or after the period in which the secrecy order was in effect. Second, the system which plaintiff was attempting to sell had neither been constructed nor tested prior to the rescission of the secrecy order. Third, the appearance of the various business plans, proposals, and presentations which plaintiff introduced into evidence lead to the impression that plaintiff's lack of business experience was a serious impediment to his success.

Finally, it should be noted that at no time did plaintiff petition the Commissioner of Patents for a permit to disclose the contents of the '557 application to persons other than those listed in "Permit A." 37 C.F.R. § 5.5 specifically provides for the issuance of such a permit or the modification of the secrecy order in appropriate circumstances.

■ On this record, the court concludes that plaintiff has failed to demonstrate "actual damages," or to present the "concrete evidence of damages" required for recovery under 35 U.S.C. § 183. *James N. Constant v. United States,* 223 Ct.Cl. 148, 159, 617 F.2d 239, 244 (1980).

2. *Expenses Incurred in Plaintiff's Attempts to Obtain Rescission of the Secrecy Order*

The record indicates that the secrecy order in question was mailed from the U.S. Patent Office to plaintiff's California residence on May 18, 1970. Plaintiff immediately prepared a "Petition to Remove Secrecy Order," dated May 23, 1970, which was

received in the U.S. Patent Office mailroom on May 25, 1970. At trial, plaintiff testified that he devoted "80 hours" of his time to preparation of this petition.

In addition, plaintiff claims that he devoted another 80 hours to consultations with legal counsel prior to the filing of an appeal with the Secretary of Commerce in relation to the denial of plaintiff's petition for rescission. Plaintiff testified that his time was valued at $25 per hour, for a total of $4,000. In addition, plaintiff produced cancelled checks endorsed by the law firm of Harris, Kiech, Russell and Kern, payee, totaling $705.40. Plaintiff testified that these checks represented payment by plaintiff for legal services rendered in association with plaintiff's attempts to obtain rescission of the secrecy order.

■ The reasonableness of these expense claims need not be addressed, since the court concludes that attorney's fees and other expenses incurred in contesting the imposition of the secrecy order are not recoverable under 35 U.S.C. § 183.

This court has repeatedly held that litigation expenses, regardless of allocation, may not be awarded against the United States in the absence of specific statutory authorization. *See, e.g., Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981). 35 U.S.C. § 183 does not specifically provide for the reimbursement of legal or other expenses incurred in contesting secrecy orders, nor does the legislative history indicate that Congress intended to include such expenses within the ambit of damages recoverable under the statute. *Hearings on H.R. 4687 before Subcommittee No. 3, Committee on the Judiciary,* 82d Cong., 1st Sess. (1951).

*3. Business Losses of RCS Associates, Inc.*

At trial, plaintiff testified that his personal corporation, RCS Associates, Inc., incurred business losses totaling $62,184 during the years 1970 through 1977. Plaintiff illustrated his testimony on this issue by reference to the Form 1040, Schedule C tax returns, allegedly filed by plaintiff for the tax years in question. These returns list income which plaintiff attributed to earnings from his consulting activities, and expenses which were incurred by plaintiff in the course of RCS' business of prosecuting patent applications and rendering engineering consulting services. These expenses included depreciation on equipment, taxes, California franchise tax, repair expenses for Mr. Constant's automobile, depreciation on the portion of Mr. Constant's personal residence used as the RCS offices, Mr. Constant's safety deposit box fees, patent and legal fees, professional dues, subscriptions to professional publications, and other miscellaneous deductible business expenses.

On cross-examination, plaintiff admitted that RCS was engaged in the prosecution of between 30 and 35 patent applications unrelated to the '557 patent during this period, and that a significant portion of the expenses reported in the tax returns in question were wholly unrelated to the '557 invention. Thus, plaintiff has made no attempt to allocate the expenses reported on these tax returns to business activities related to the '557 patent.

When asked how the business losses reported in the RCS tax returns could be attributed to the imposition of the secrecy order, plaintiff suggested that had he been successful in obtaining contracts for the development and sale of the '557 invention, contract revenues would have been available to offset these various personal business expenses.

■ Even if plaintiff had fairly allocated a portion of RCS' business expenses to the marketing activities associated with plaintiff's attempt to commercialize the '557 invention, these expenses would not be recoverable as damages caused by the imposition of the secrecy order. As previously noted, the court concludes that the secrecy order did not substantially affect plaintiff's ability to market the '557 invention. Since the secrecy order was not a factor in plaintiff's business failures associated with the '557 invention, no nexus exists between the imposition of the secrecy order and the business losses of RCS.

### 4. Interference with the Right to Compete

As a further ground for relief, plaintiff argues that some intrinsic value exists in the right to compete in the marketplace. Plaintiff further asserts that, as a result of the imposition of the secrecy order in question, plaintiff was prevented from competing in the automatic vehicle identification market. Plaintiff concludes that the value inherent in plaintiff's right to compete was thus appropriated by the United States, necessitating an award of damages under 35 U.S.C. § 183.

However, plaintiff has not indicated any additional actual damages alleged to have been suffered as a result of this interference, nor supplied any basis upon which damages for this species of interference could be calculated.

As a practical matter, the court is unable to perceive any meaningful difference between this element of plaintiff's claimed damages and the damages allegedly resulting from the "interference with business opportunities" previously discussed. As noted *supra*, plaintiff has failed to adduce any probative evidence which would tend to show that actual injury resulted from the imposition of the secrecy order. Thus, whether the act complained of, the imposition of the secrecy order, is termed "interference with the right to compete," or "interference with business opportunities," the result here is identical.

█ To the extent that plaintiff seeks a conjectural or nominal award for the infringement of plaintiff's "right to compete," plaintiff's claim must be rejected. As this court has previously indicated, "actual damages" must be proven as a prerequisite to recovery under the statute. *Constant, supra.*

### 5. Delay in Filing Foreign Patent Applications

█ As the final element in plaintiff's claimed damages, plaintiff seeks compensation for the delay in filing foreign patent applications caused by the imposition of the secrecy order. The delay of plaintiff's foreign application process is uncontested. However, plaintiff did not demonstrate any actual injury which resulted from this delay. Apparently, upon rescission of the secrecy order, plaintiff caused patent applications to be filed in Great Britain, France, West Germany, and Japan. According to the record, patents issued upon the British and French applications, the West German application was expressly abandoned, and the Japanese application is still pending. No other evidence was adduced in relation to this issue, and on this record, the court finds that plaintiff has failed to prove compensable injury resulting from the delay caused by the imposition of the secrecy order.

### III. Conclusion

In the opinion of the court, defendant's motion to dismiss plaintiff's petition for insufficiency of evidence is well-founded. Plaintiff's evidence provides little or no support for his theory of recovery. For the most part, the vast market envisioned by plaintiff for AVI technology has never materialized. This fact alone renders plaintiff's emphasis upon the timing of the secrecy order largely irrelevant. Plaintiff's ultimate failure to find buyers for his invention cannot, on this record, be attributed to the interference caused by the secrecy order.

On the basis of the credible and competent evidence of record, the court concludes that plaintiff has failed to prove the "actual damages" required for recovery under 35 U.S.C. § 183. *Constant v. United States*, 223 Ct.Cl. 148, 617 F.2d 239 (1980); *See also, Lear Siegler, Inc. v. United States*, Ct.Cl. No. 483–79C (Order of October 17, (1980).

Accordingly, plaintiff's petition is dismissed.

### CONCLUSION OF LAW

Upon the findings and foregoing opinion, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

## FINDINGS OF FACT

1. This action is brought by James N. Constant (plaintiff) against the United States of America (defendant) pursuant to 35 U.S.C. § 183. Plaintiff seeks compensation for damages alleged to have been caused by defendant's imposition of a secrecy order under 35 U.S.C. § 181 against the contents of a patent application which later issued as U.S. Patent No. 3,691,557.

2. U.S. Patent No. 3,691,557 (the '557 patent), entitled "System for Identifying Objects Using an Encoding Array for Each Object," was issued on September 12, 1972, on the basis of Application Serial No. 870,-598, filed on September 22, 1969, in the name of James N. Constant, inventor.

3. Plaintiff has retained all rights to the '557 patent since the filing date of Application Serial No. 870,598.

4. Pursuant to a request by the Armed Services Patent Advisory Board, the Patent Office issued a secrecy order on May 18, 1970, forbidding the disclosure of the contents of Application Serial No. 870,598. As provided by 35 U.S.C. §§ 181, 182, 185, and 186, plaintiff was ordered to prevent the disclosure of the invention set forth in the application, or any material information relating to the invention, to any person not cognizant of the invention prior to the date of the secrecy order, under penalty of fine, imprisonment, or forfeiture of all patent rights in the invention.

5. In conjunction with the secrecy order, the Patent Office issued a document known as "Permit A," which allowed plaintiff to disclose his invention to:

(a) Any officer or employee of any department, independent agency, or bureau of the Government of the United States; or

(b) Any person designated specifically by the head of any department, independent agency or bureau of the Government of the United States, or by his duly authorized subordinate, as a proper individual to receive the disclosure of the above indicated application.

However, the permit required plaintiff to ensure that all reasonable safeguards would be taken to prevent unauthorized disclosure of the invention.

6. Pursuant to 37 C.F.R. § 5.4 (1970), plaintiff petitioned the Commissioner of Patents on May 23, 1970, requesting that the secrecy order be rescinded. The text of that letter is set forth below:

I hereby petition you to remove the subject secrecy order on the grounds that the order is secretive, vain, futile, causes immediate damage present and future, is inhibitory, confiscatory, and unjust.

The order is secretive since it does not specify the exact way in which the National Security may be compromized [sic] through unauthorized disclosure of the reference application. Your petitioner is left only to assume the connection between the reference application and the National Security. Your petitioner declares his desire to submit his activity, property, and livelyhood [sic] to the National Interest provided it can be shown that the reference application impacts same. The order does not reveal the connection between the reference application and the National Security.

The order is vain since it restricts the use of common ideas over specific or preferred hardware configurations disclosed or claimed in the reference application and drawings. No portion of the disclosure can possibly or conceivably be used against the National Interest. How can a device proposed to read labels off boxcars, containers, cars, assembly line products, and objects in general, be used against the National Interest? Your petitioner can only assume that certain ideas presented in the reference application must have attracted some possible remote bearing to the National Security. Such ideas, however, have already been published in the common literature (Enclosures 1, 2, and 3), to wit the concept of synthetic radar as it applies to planes flying over target areas, certainly not as it may apply to reading labels off [sic] objects. Such common ideas are now restricted by the order.

The order is futile since it restricts public facts. It is a well known public fact (Enclosures 1, 2, and 3) that synthetic microwave and optical radar achieves a high degree of resolution of objects within its beam. Such public facts are therefore available to all inside our [sic] outside the Public Interest. The order restricts such public facts.

The order causes immediate damage present and future since it restricts free legitimate commercial enterprise. The disclosure in the reference application is the basis for the formation and sustenance of a private corporation with present employees (9), committments [sic] for financing ($1,500,000), committments [sic] to research and development in-house and with suppliers ($50,000), business proposals in force ($900,000), business proposals in preparation ($1,000,000), preproposal business inquiries (73) with total forecasts of doing a $5,000,000 yearly business by 1976, and with current and committed overhead, general, and administrative expenses ($1,000 daily). This activity is now restriced [sic] by the order. The order is inhibitory since it restrains free trade and thereby prevents gain by reason of competitive technical advantage. At present, potential application of the disclosure in commerce enjoys limited or no competition and consequently has technical advantage. This advantage, its present and future value, will decrease and dissipate with time. This advantage is now restricted by the order.

The order is confiscatory since it cancels property (reference application) rights. The reference application is the property of the applicant both prior to and following allowance of patent rights and certainly must be presumed to be his property up to such time as his application may be disallowed. The order restricts commercial activity based upon the unlimited, unrestricted, use of the applicant's property rights.

The order is unjust since it does not provide for the compensation of property (reference application) taken ostensibly for the public use. U.S.C. Title 35 Section 183 indicates that the applicant for a patent shall have the right to apply for compensation to the head of the department or agency who caused the order to be issued, beginning at the date said applicant is notified that, except for said order, his application is otherwise in condition for allowance. The order restricts compensation for damage for the period following the order date only upon allowance and offers no compensation if the patent application is disallowed. Commercially speaking, whether allowance is made or is not is immaterial since the early exploitation of technical advantage is what counts and its restriction by the order does not provide for compensation of this damage whether a patent is granted or not. The order restricts compensation for commercial damage whether or not the reference application is allowed.

Your petitioner, James N. Constant, a citizen of the United States, a resident of Claremont, California, whose postoffice [sic] address is 1603 Danbury Drive, urgently prays that you remove secrecy order dated 18 May, 1970, imposed against the reference application. No contract between the Government and applicant has existed in the past or now exists.

7. On November 23, 1970, plaintiff petitioned the Commissioner of Patents for a permit authorizing disclosure of the invention set forth in Application Serial No. 870,598 to legal counsel for the purpose of pursuing legal and administrative claims against the government in connection with the imposition of the secrecy order.

8. By letter of April 15, 1971, Mr. E.M. Drazdowsky, an employee of the Security Group, Licensing and Review, of the U.S. Patent Office, informed plaintiff that plaintiff's petition for rescission of the secrecy order had been denied.

9. On April 26, 1971, the U.S. Patent Office issued a permit authorizing plaintiff to disclose the contents of Application Serial No. 870,598 to the law firm of Harris, Kiech, Russell and Kern of Los Angeles, California.

10. By letter of June 8, 1971, plaintiff, by his authorized attorneys, appealed the denial of his petition for rescission of the secrecy order to the Secretary of Commerce pursuant to 35 U.S.C. § 181 and 37 C.F.R. § 5.8 (1971).

11. Plaintiff's appeal of the denial of his petition for rescission of the secrecy order, as prepared by legal counsel, comprises two and one-half pages of single-spaced text.

12. At trial, plaintiff introduced cancelled checks endorsed by the law firm of Harris, Kiech, Russell and Kern, payee. These checks totaled $705.35. Plaintiff testified that this sum represented the legal fees expended by plaintiff in attempting to obtain rescission of the secrecy order.

13. Plaintiff has not alleged that the imposition of the secrecy order was an abuse of discretion or an act in excess of the authority delegated to the Commissioner of Patents.

14. On August 27, 1971, the secrecy order in question was rescinded by the U.S. Patent Office, and prosecution of patent Application No. 870,598 was continued. The secrecy order had been in effect for a period of approximately 15 months.

15. The invention disclosed in the '557 patent is a system for the identification of moving objects. The system includes a synthetic aperture radar transmitter, operating at microwave frequencies, which scans a label attached to the moving object. The label consists of an array of metallic dipoles of a length one-half that of the wavelength of the electromagnetic signals produced by the microwave transmitter. The dipoles in the array can be arranged in a sequence which permits the encoding of information in the array. When scanned or illuminated by the transmitter signals, a given dipole in the array produces a resonant pulse which is detected by a receiver. The sequence of such resonant pulses can then be processed and decoded to provide an identification of the object to which the dipole array, or label, is affixed.

16. As described by plaintiff, possible applications of the invention disclosed in the '557 patent include various types of vehicle identification systems. In these applications, known as automatic vehicle identification (AVI), labels containing the dipole array are affixed to moving vehicles, and scanned by a fixed transmitter/receiver, or interrogator, as the vehicle moves past the interrogator. By decoding the information reflected by the label to the interrogator, the vehicle can be identified.

Analogous applications include the automatic identification and monitoring of shipping containers, parcels, mail, or components moving along conveyors in assembly operations.

17. According to plaintiff, the advantages of the '557 patent invention include modest label size relative to the object to be identified, high resolution, and limited utilization of the radio frequency spectrum. A particular advantage of the '557 invention when compared to optically based AVI systems is its ability to scan the identification label when the label is obscured by dirt, snow, or other environmental conditions which compromise the operation of systems relying upon reflected signals in the visible portion of the electromagnetic spectrum.

18. In 1967, the Association of American Railroads (AAR) adopted a vehicle monitoring system known as ACI, for automatic car identification. This system relied upon optical technology, in which a trackside scanner "read" labels on the sides of rolling stock. Each label consisted of several colored bands, which were oriented such that variations in length and color could serve as the basis for coding information. By 1970, virtually all U.S. railroads were committed to implementing the ACI system. According to a study released in March 1972, 92 percent of the U.S. freight cars sampled were labeled with ACI labels by July 1971.

Thus, despite the apparent advantages of plaintiff's invention relative to the optical ACI system, the railroad industry did not constitute a receptive market for the '557 invention during the period in which the secrecy order was in effect.

19. Between March 1970 and May 1970, plaintiff contacted various suppliers of elec-

tronic equipment to determine suitable sources of the components needed to construct a prototype of the '557 invention. However, during the period in which the secrecy order was in force, plaintiff did not purchase any such components. Moreover, the record does not indicate that any appreciable investment in equipment or supplies took place prior to the imposition of the secrecy order.

20. In July 1967, plaintiff formed a company known as RCS Associates, Inc. (RCS), which was subsequently incorporated in November 1968. According to a 5-year plan prepared by plaintiff in 1970, the business of RCS was to include engineering consulting services, research and development of novel radar, computer, and communications systems, and marketing certain proprietary technologies developed by RCS, including the '557 invention.

Plaintiff has been the president and sole shareholder of RCS since the company's formation. As of the date of trial, no income had ever been earned by RCS which was not the result of consulting services personally performed by plaintiff.

21. Prior to the date the secrecy order was imposed, plaintiff had received several letters of inquiry from persons to whom he had forwarded unsolicited proposals describing the '557 invention. However, as of the date of the secrecy order, plaintiff had accepted no offers of contracts for the manufacture or sale of systems embodying the '557 invention, nor had any person tendered an offer of contract.

22. During 1970, plaintiff sought bank financing for RCS, in order to obtain sufficient capital to begin construction of a prototype AVI system. However, each financial institution contacted declined to offer such financing. The record does not indicate that the secrecy order had any effect on plaintiff's ability to obtain such financing. In fact, one institution noted that plaintiff's financing requests amounted to a request for equity capital, which the institution did not consider to be a proper use of bank financing.

23. As an alternative means of financing a prototype of the '557 invention, plaintiff, through RCS, unsuccessfully sought to obtain study or development contracts with agencies of the United States Government or private corporations with possible interest in the AVI system.

24. During the time that the secrecy order was in effect, plaintiff did not petition the Commissioner of Patents for a permit to disclose the contents of the '557 patent application to persons other than those listed in "Permit A." 37 C.F.R. § 5.5 specifically provides for the issuance of such a permit or modification of the secrecy order in appropriate circumstances.

25. On July 30, 1970, RCS Associates was invited to submit a proposal to the Urban Mass Transportation Administration of the Department of Transportation for the valuation and testing of an Automatic Vehicle Monitoring System. The purpose of the study was to study vehicle location technologies and demonstrate their feasibility in an urban environment. Plaintiff submitted a proposal on August 17, 1970, which was rejected on December 23, 1970. The letter which informed plaintiff that the proposal had been rejected noted that the RCS AVI system as proposed was not considered to be "within the zone of technical superiority being considered for further negotiation."

26. On February 24, 1970, plaintiff submitted an unsolicited proposal to the former Post Office Department, outlining a plan designed to determine the feasibility of implementing the RCS AVI system in postal applications. Following review by Post Office Department technical personnel, the proposal was rejected on August 3, 1970, as impractical for letter mail applications.

27. On April 21, 1970, plaintiff submitted an unsolicited proposal to the Federal Railroad Administration, outlining a plan to study the possibilities of implementing the RCS AVI system as a railroad vehicle identification system. However, this proposal was rejected on August 13, 1970, on the basis that plaintiff's AVI system was not yet reduced to practice.

28. On August 26, 1970, plaintiff submitted an unsolicited proposal to the Federal Highway Administration, which outlined a plan to design and build a prototype AVI system using the technology later disclosed in the '557 patent. However, citing a lack of interest and funding, the agency declined to conduct a complete evaluation of the plan and rejected the proposal on October 23, 1970.

29. Plaintiff continued to present unsolicited proposals to various United States corporations during the period in which the secrecy order was in effect. However, no contracts or offers of contracts resulted from these attempts.

30. On February 22, 1971, plaintiff filed a petition with the Commissioner of Patents and Trademarks, requesting that the Commissioner:

order the agency requesting the issuance of a secrecy order against the reference application to file on his behalf without further delay patents [sic] applications in the following foreign countries: Australia, Belgium, Canada, Denmark, France, Germany, Hong Kong, Italy, Japan, Netherlands, Sweden, Switzerland, Taiwan, United Kingdom, Union of South Africa, and others as may be designated from time to time by your petitioner and that said patents [sic] applications be filed in these countries * * * by no later than 1 April, 1971, as time is of the utmost essence.

However, no action was taken on plaintiff's petition.

31. During the time that the secrecy order was in force, plaintiff did not petition the Commissioner of Patents for a license to file foreign applications disclosing the '557 invention, as provided by 35 U.S.C. § 182 and 37 C.F.R. § 5.5.

Following rescission of the secrecy order, plaintiff filed applications covering the '557 invention in the United Kingdom, France, West Germany, and Japan. At trial, plaintiff testified that patents were issued in the United Kingdom and France, that the West German application was abandoned, and that proceedings were still pending in Japan.

32. After the secrecy order had been rescinded, plaintiff was invited to demonstrate the AVI system later disclosed in the '557 patent to officials of the Port of New York Authority in a preliminary screening test known as the Automatic Bus Identification Project. However, plaintiff was unable to construct and demonstrate a prototype by the deadline of March 15, 1972.

33. In 1972 plaintiff built a prototype of the '557 invention at a cost of approximately $15,000. This cost represented the costs of parts only, and did not reflect the value of plaintiff's personal time contributions to the project.

34. On February 2, 1973, the United States Army Mobility Equipment Research and Development Center issued a Request for Quotations, seeking bids for the development of a prototype "Container Reporting and Supply Management System," which contemplated a type of automatic container monitoring and control system. RCS Associates was one of the sources solicited. On February 26, 1973, RCS Associates, under cover of a letter written by plaintiff, submitted a proposal for consideration. However, on July 18, 1973, plaintiff was informed that the proposal of RCS Associates had been rejected. The letter of rejection noted:

Your proposal ignored the more developmental portion of the RFQ * * * and deviated significantly from the solicitation terms and conditions in respect to both the remaining technical content as well as general contractual areas. The Government has been unable to accept the RCS conditions as enumerated in the Cost and Contractual Data portion of the proposal. This installation does not primarily regard this procurement as a "best-efforts" requirement and cannot waive any regulatory and/or statutory terms with respect to its performance. Your proposal conveyed an impression of negativity and lack of confidence in meeting RFQ requirements. Further-

more, you completely failed to address several major performance areas, did not appear to satisfy technical requirements in certain facets that were addressed (i.e., reading distance, label size, system ruggedness, label-to-interrogator resolution), and were unable to effect reliability in such characteristics as system accuracy and system performance in uncontrolled environments. Although your scientific approach is basically sound, its effect had been negated by a preponderance of unacceptable factors.

35. Plaintiff admitted at trial that subsequent to 1973, neither plaintiff nor RCS made any serious effort to enter the AVI or AVM markets.

36. On January 31, 1977, the American Association of Railroads issued a Request for Proposals (RFP), inviting plaintiff and other companies to submit proposals for ACI systems to be implemented on U.S. railroads. Plaintiff testified at trial that RCS Associates did not respond to this request.

37. RCS reported losses on its federal income tax returns for the years 1970, 1972, 1973, 1974, 1975, 1976, and 1977. However, at trial plaintiff admitted that the expenses of operating RCS reported on these returns could not be allocated to the promotion of the '557 invention. During this period, RCS was involved in the prosecution of some 30 other patent applications, as well as other activities unrelated to the '557 invention.

Carl M. Fink, Washington, D.C., for plaintiff.