CITIES SERVICE PIPE LINE COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 101–82L.

United States Claims Court.

Dec. 30, 1983.

**208**

Charles L. Berry, Houston, Tex., with whom were Sharon M. Mattox and Vinson & Elkins, Houston, Tex., for plaintiff.

Lawrence R. Liebesman, Washington, D.C., with whom were Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., and George B. Henderson, Cambridge, Mass., for defendant.

### MEMORANDUM OF DECISION

KOZINSKI, Chief Judge.

Plaintiff owns an underground pipeline through which it transports oil under pressure. Where the pipeline crosses a waterway it is covered by mud. On the evening of March 20, 1980, the pipeline burst, spewing approximately 8800 barrels of oil into Carpenter's Bayou, a shallow, slow-running creek. Plaintiff cleaned up the mess at a cost of some $880,000. It then brought this action under the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1321(i)(1) (1976), to recover its cleanup costs from the United States. Plaintiff alleges the spill was caused solely by the act of a third party.

The linchpin of plaintiff's case at trial was the testimony of its metallurgy expert who had examined and analyzed the rupture. The metallurgist reported that a piece of heavy equipment had struck the pipeline. This had weakened the pipeline and eventually led to its rupture. The metallurgist could not specify when the initial damage had been inflicted except to say that it had occurred within the preceding ten years and that it could not have occurred immediately prior to the rupture.

Defendant moved for judgment at the end of plaintiff's case arguing that plaintiff had not established that the pipeline rupture and oil spill were caused "solely by . . . an act or omission of a third party." 33 U.S.C. § 1321(i)(1) (1976).

### Discussion

1. *The Motion*

■ RUSCC 41(b) provides that "[a]fter plaintiff has completed the presentation of his evidence, defendant . . . may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." In considering such a motion the court, as trier of fact, may weigh the evidence presented and grant judgment for defendant if it finds plaintiff's proof factually unpersuasive. In so doing it may refuse to credit the testimony of plaintiff's witnesses or decline to draw factual inferences necessary to plaintiff's case. *Howard Industries, Inc. v. United States,* 115 F.Supp. 481, 126 Ct.Cl. 283, 287–90 (1953); *Constant v. United States,* 1 Cl.Ct. 600, 603 (1982) (SETO, J.). *See generally* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2371 (1971). Here, however, the court credits plaintiff's evidence and draws therefrom all suggested inferences. At issue then is whether the case presented by plaintiff entitles it to judgment.

## 2. The Merits

The FWPCA provides that the cost of cleaning up spilt oil should generally remain with the owners of facilities discharging the oil. Only when the spill results from four specific causes, deemed to be completely outside the owner's control, does the statute provide relief by shifting the cleanup cost to the public. 33 U.S.C. §§ 1321(f), (i) (1976). Congress intended that cases where the public pays for cleanup would be the exception, not the rule. A plaintiff must therefore carry a heavy burden to recover under the FWPCA. *Atlantic Richfield Co. v. United States,* 1 Cl.Ct. 261 (1982) (KOZINSKI, C.J.).

To prevail, a plaintiff must make both an affirmative and a negative showing. First, it must show that the spill was entirely the result of one or more of the causes listed in section 1321(i)(1). *See, e.g., Reliance Insurance Co. v. United States,* 230 Ct.Cl. ——, 677 F.2d 844 (1982); *Sabine Towing & Transportation Co. v. United States,* 229 Ct.Cl. ——, 666 F.2d 561 (1981). Second, even where causation is so limited, plaintiff must establish that it could not have prevented the spill through the exercise of due care. *See, e.g., Travelers Indemnity Co. v. United States,* 230 Ct.Cl. 867, *cert. denied,* 459 U.S. 1015, 103 S.Ct. 374, 74 L.Ed.2d 508 (1982). The court considers plaintiff's showing on these points in reverse order.

A. Plaintiff has failed to establish that it was unable to prevent the spill through the exercise of due care. Its metallurgy expert testified that the pipeline had been damaged by heavy equipment. He further explained that when a pipeline is damaged and remains unrepaired, forces are set in motion that inevitably lead to a rupture. First, the impact itself causes the pipe metal to become brittle, diminishing its resistance to fracture. Second, the injury may cause surface cracks that grow in length and depth with the passage of time. Finally, the injury leaves dents and gouges that focus internal stresses onto the damaged area.[1] This means that a pipeline that is operating at some 950 pounds per square inch, as this pipeline did on the night of the rupture, is experiencing a much greater pressure in the area of the dent or gouge.[2] This intense pressure causes further deterioration of the damaged metal, increasing its brittleness and enlarging surface cracks until the pipeline bursts, as this one did.

Plaintiff was aware that the pipeline might sustain damage from heavy equipment. It was also aware that, upon sustaining a dent or gouge, the pipeline would be subjected to continuous stresses and deterioration that would inevitably lead to a rupture. Plaintiff should also have been aware that rupture of a pipeline transporting oil under pressure poses risks that far exceed those from other types of leaks. The explosive force of this rupture sent oil hurtling over a 10 acre area, blackening the tops of pine trees 400 yards away. According to plaintiff, such a rupture would discharge a minimum of 3000 barrels (125,000 gallons) of oil before the flow could be stopped.[3]

These are facts plaintiff could not responsibly ignore. Damage to the pipeline and the consequent rupture were foreseeable, particularly where the pipe was not covered by solid ground but only by the soft and

---

1. The increased pressure in the area of a dent or gouge is created because the pipeline loses its circular shape. The internal pressure is then unevenly distributed around the pipeline's perimeter. The oil flowing through the pipe pushes outward on the dent in order to restore the pipeline's circular shape, subjecting the damaged area to high bending stresses.

2. Pursuant to regulations of the Department of Transportation, a pipeline may be operated at 80% of the pressure for which it has been hydrostatically tested. 49 C.F.R. § 195.-406(a)(3) (1982). *See* n. 5 *infra.* Ten years prior to the rupture the pipeline had been tested at 1260 psi, which meant it could be operated up to 1000 psi. Under the metallurgist's analysis, it would appear that after the damage some portions of the pipeline were subjected to pressures exceeding those permitted by the regulations.

3. Because of a mechanical failure, this rupture in fact resulted in a discharge of almost three times that quantity of oil.

shifting mud of the bayou. The risk of damage from equipment used near the pipeline or from objects floating in the bayou should have been apparent.[4] Moreover, where the pipeline traversed a flowing body of water, an additional danger existed because any oil spilled would be carried downstream and dispersed, endangering a large area and rendering cleanup efforts difficult and expensive.

Plaintiff regularly inspected the pipeline right-of-way, principally by aerial overflights. The purpose of those inspections was to detect hazardous activities near the pipeline. As this case demonstrates, however, such inspections could not assure detection of all potential damage to the pipeline. Plaintiff had no program for visually inspecting the pipeline itself, even at those points where it was most vulnerable or where a rupture would cause particularly grievous harm. Nor did plaintiff run periodic hydrostatic tests[5] of the pipeline for the purpose of locating and repairing weak spots. Nothing on this record suggests that such means of detecting injuries to the pipeline were unavailable or economically infeasible.

That a pipeline will suffer damage from time to time is inevitable. Indeed, plaintiff's expert explained that "mechanical damage [is] a common cause of in-service pipeline failures." Expert Report at 7. Plaintiff, nevertheless, argues that it had no responsibility to discover and repair such damage. In plaintiff's view, it was entitled to stand by and let the injury work its way into a rupture which spewed massive quantities of oil into the nation's waterways. The court cannot accept this proposition and concludes that plaintiff shares culpability for the rupture because of its protracted failure to detect and repair the damage.[6] *See generally Reliance Insurance Co.,* 230 Ct.Cl. at ——, 677 F.2d at 848; *Atlantic Richfield Co.,* 1 Cl.Ct. at 263.

■ **B.** Even if plaintiff were entirely without fault for the rupture, the court would grant defendant's motion because plaintiff has failed to establish that the oil spill was caused *solely* by the act of a third party within the meaning of the FWPCA. While plaintiff showed that a third party may have damaged the pipeline, it also established that this damage alone was insufficient to cause a rupture. Plaintiff's use of the pipeline, over a period of what may have been ten years, was as much a cause of the oil spill as the initial damage.

■ No culpability attaches to plaintiff's actions that amount to normal use of the pipeline. However, it is not merely culpable acts that will preclude a plaintiff's recovery for oil cleanup costs. "Any conduct, however slight, on the part of an owner or operator contributing to a spill ... negate[s] relief." *Reliance Insurance Co.,* 230 Ct.Cl. at ——, 677 F.2d at 849. The reason for this is clear from the language of the FWPCA: To recover, a plaintiff must establish not merely that the oil spill was the result of one or more of the causes listed in section 1321, but also that no other cause contributed to the spill. Plaintiff's own contributing actions—even those that are entirely innocent—will preclude recovery because they are not among the causes listed in section 1321(i)(1); causation therefore

---

4. While the bayou was normally not very deep or fast running, its water level was known to rise sharply during heavy rainfalls. Damage from floating objects was therefore forseeable.

5. Although hydrostatic testing was not fully explained on the record, the court understands it to consist of pressurized circulation of water through the pipeline. The test is successful for a particular pressure if the pipeline does not burst.

6. It is unclear whether plaintiff's culpability in failing to prevent an oil spill must rise to the level of common law negligence. There are significant indications that a lower level of culpability will suffice. For example, the legislative history indicates that "[a]ny culpability on the part of the owner ... vitiate[s] the exemption." S.Rep. No. 351, 91st Cong., 1st Sess. 6 (1969). *See also Atlantic Richfield Co.,* 1 Cl.Ct. at 263 (plaintiff must be "entirely without fault for the spill"); *United States v. Bear Marine Services,* 509 F.Supp. 710, 715 (E.D.La.1980) ("[t]he discharger must be totally free of fault"). In any case, the court concludes that plaintiff's failure to prevent the spill amounts to negligence.

cannot be confined as required by that section.

Here, ten years may have passed since the third party action that caused the initial damage. That damage would never have matured into a rupture without plaintiff's continuing use of the pipeline and the resultant wear and tear. Under these circumstances, it would offend common sense to hold that the third party was the sole cause of the oil spill.

Conclusion

Defendant's RUSCC 41(b) motion is granted. The clerk is directed to dismiss the petition with costs to the prevailing party. 28 U.S.C. § 2412(a) (Supp. V 1981); RUSCC 54(d).