**SABINE TOWING & TRANSPORTATION CO., INC.**

v.

**The UNITED STATES.**

**No. 44–76.**

United States Court of Claims.

Dec. 16, 1981.

Celestino Tesoriero, New York City, attorney of record, for plaintiff; Grainger & Tesoriero, New York City, of counsel.

Thomas L. Jones, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

Before FRIEDMAN, Chief Judge, KASHIWA and BENNETT, Judges.

## OPINION

BENNETT, Judge, delivered the opinion of the court:

Plaintiff's action is brought under 33 U.S.C. § 1321(i)(1) (1976) for recovery from the Government of plaintiff's costs in cleaning up an oil spill from one of its vessels. Specifically, plaintiff claims that the spill was caused "solely by an act of God" within the meaning of subsection (A) of that section, entitling plaintiff to such recovery. By order of April 27, 1978, 216 Ct.Cl. 480, this court denied plaintiff's motion for summary judgment because findings were needed on the circumstances of the spill. Defendant's cross-motion was also denied for the reason that common-law precedents, if used to assist in determining the meaning of subsection (A), indicated that plaintiff might prevail. Trial was had before Trial Judge Louis Spector, and the case is now before the court on defendant's exceptions to the trial judge's recommended decision, filed October 1, 1980, pursuant to Rule 134(h), that section 1321(i)(1)(A) does cover the circumstances found to surround plaintiff's spill. We reverse this determination and hold that plaintiff has not made out a case that falls under section 1321(i)(1)(A).[1]

On March 29, 1975, plaintiff's vessel, the T/S *Colorado*, struck an unknown underwater object in the Hudson River channel. The *Colorado* was bound for Rensselaer, New York, with a cargo of petroleum products, and was opposite Roger's Island at the time of the incident. Although the crew

---

1. The court rejects the trial judge's conclusion of law but adopts his findings of fact. The findings have been furnished to the parties and are not printed here since those necessary to the decision are included in this opinion.

did not realize that the ship's hull had been ruptured, the No. 2 port wing tank had suffered a tear that was some 20 feet long and 3–4 inches wide.

During the time the *Colorado* was moving up the Hudson, there was a freshet condition in the river, an increased rate of flow due in this instance to rain and the spring runoff of melted snow. Freshets raise the level of the river, but they also wash down sediment, gravel, logs, rocks and other debris. Although there is no way to determine what may be rolled down the river and embedded during a freshet, it is normal practice not to interrupt regular navigation on this account. It has been assumed through all of the litigation in this case that the object that the *Colorado* struck was something that had been deposited in the river bed during the freshet that then existed.

There was no significant oil spillage from the ship until the ruptured tank was opened for discharging at Rensselaer. The opening released a partial vacuum in the tank that had been created as the oil inside had cooled from its high loading temperature and allowed 30,000 to 50,000 gallons to escape out of the tear and into the Hudson. Plaintiff contracted to have the oil cleaned up, and the cost has been stipulated at $113,943.41.

## I

To understand 33 U.S.C. § 1321 as it applies to this case, it is helpful to chart the background of congressional action in allocating the burden of oil spill cleanup costs. Congress entered the field with section 211 of title II of the Clean Water Restoration Act of 1966, Pub.L.No. 89–753, 80 Stat. 1246, 1252 (1966). This amended the Oil Pollution Act, 1924, Pub.L.No. 68–238, 43 Stat. 604 (1924),[2] to establish that cleanup costs resulting from any grossly negligent or willful discharge of oil by any vessel onto the navigable waters of the United States could be recovered by the Government by a lien on such vessel and a proceeding *in rem*. By 1970, however, Congress was dissatisfied with the coverage of the Clean Water Restoration Act, and among its concerns, pertinent to the present suit, was the narrowness of the gross negligence and willfulness standards. *See* H.R.Rep.No. 127, 91st Cong., 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Ad. News 2691, 2692. Congress then passed the Water Quality Improvement Act of 1970, Pub.L.No. 91–224, 84 Stat. 91 (1970), which repealed the Oil Pollution Act, 1924 and its amendments, Pub.L.No. 91–224 at title I, § 108, 84 Stat. 113, and established more stringent liability, Pub.L.No. 91–224 at title I, § 102, 84 Stat. 91. It is this liability section, as incorporated into the Federal Water Pollution Control Act Amendments of 1972, Pub.L.No. 92–500, title III, § 311, 86 Stat. 862 (1972) and codified at 33 U.S.C. § 1321 (1976), that this court must construe in this case.[3]

Under 33 U.S.C. § 1321, the basic responsibility for oil spill cleanup is on the President, Conf.Rep.No. 940 (for the Water Quality Improvement Act of 1970), 91st Cong., 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Ad. News 2712, 2723, although spillers may make the cleanup themselves. Either way, liability is strict. *See Steuart Transp. Co. v. Allied Towing Corp.*, 596 F.2d 609 (4th Cir. 1979). The only variations are: (1) that a limitation is imposed on the government's recovery of costs unless the spillage was due to "willful negligence or willful misconduct within the privity and knowledge of the owner" and (2) that the spiller's liability is removed if the spillage was caused "solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing causes." Under subsection (f) of the section, if the United States has incurred cleanup costs,

---

2. Codified at 33 U.S.C. §§ 431 to 437; repealed by Pub.L.No. 91–224, title I, § 108, 84 Stat. 113 (1970).

3. For additional history of federal water pollution control, see *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1161–62 (2d Cir. 1978).

then it may recover against the vessel or against the owner or operator, in any court of competent jurisdiction, if the spiller cannot prove that one of the liability exceptions applies. Under subsection (i), if the spiller has incurred cleanup costs, then it may recover against the United States, by suit in this court, if it can prove that one of the exceptions does apply.

## II

It is clear from this history of the development of section 1321 that the only issue in this case is whether plaintiff has proved that one of the liability exceptions applies to the circumstances surrounding its spill. Liability is otherwise strict, and recovery cannot be had.

Plaintiff presses only for the applicability of the first exception, that its spill was caused "solely by an act of God." The questions, then, are two: (1) whether the unknown debris that the *Colorado* struck, or the freshet condition that deposited it, falls within the meaning of "an act of God" as used in the statute and (2) whether the debris or the freshet was the "sole" cause. It is not necessary to reach this second question and we do not do so.

■ The · phrase "an act of God" is defined by Congress for the purposes of section 1321 as "an act occasioned by an unanticipated grave natural disaster." 33 U.S.C. § 1321(a)(12). For the reason that the legislative history of this definition is short, the order cited in the first paragraph of this opinion suggested resort to the common-law meaning of "act of God" to help in determining how the phrase should be applied in section 1321 cases. We now take caution, however, from a recent Supreme Court case on the inappropriateness of using judicially created rules of decision in areas where Congress has legislated. *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (federal common law supplanted by any federal statute addressing the question). We now believe that common-law cases on acts of God, to the extent that they embody judicial decisions on allocating the burden of mishap, should not be used in determining the allocation that Congress intended in section 1321.

The definition of "act of God" as it appears at section 1321(a)(12) emerged from the conference committee for the final version of the Water Quality Improvement Act of 1970. The House version of the Act had left the phrase undefined, and the definition in the Senate version was one that the conference committee was concerned did not require a lack of foreseeability.[4] The committee's substitution, as the conference report explains, was intended to be very restrictive.

> The term "act of God" is defined to mean an act occasioned by an unanticipated grave natural disaster. This definition varies from that of the Senate definition and, under this definition, only those acts about which the owner could have had no foreknowledge, could have made no plans to avoid, or could not predict would be included. Thus, grave natural disasters which could not be anticipated in the design, location, or operation of the facility or vessel by reason of historic, geographic, or climatic circumstances or phenomena would be outside the scope of the owner's or operator's responsibility.

Conf.Rep.No. 940, 91st Cong., 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Ad. News 2712, 2722. Thus, it is clear that the definition, as enacted, should be strictly construed. The conference committee makes plain that an occurrence shall be an "act of God" if it results solely from a grave natural disaster and if that grave natural disaster is wholly unanticipated.

■ On the first point, whether there was a "grave natural disaster" on the facts of the case before us, we hold that there was not. Neither the spring runoff of melted snow nor the object struck by the *Colorado* was a disaster as the word is com-

---

4. The Senate provision read, "an act · occasioned exclusively by violence of nature without the interference of any human action."

Conf.Rep.No. 940, 91st Cong., 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Ad.News 2712, 2719.

monly used.[5] There was uncontradicted testimony at the trial that the flow rate on the Hudson on the day of the incident was equaled or exceeded on 25 percent of all the days in that water year and that those days were evenly distributed over that year. To contend that the freshet on March 29, 1975, was a disaster is to contend that the Hudson is in a disaster condition one-quarter of the time. Furthermore, Congress restricted its definition to "grave" disasters, making clear that the occurrence must be of great magnitude before it falls within the liability exception of section 1321.

■ Plaintiff claims that the tearing of the *Colorado* was certainly a disaster from the plaintiff's point of view. Section 1321, however, is not written so subjectively. The definition of "act of God" requires that the disaster be the cause and not the effect.

On the second point, whether the circumstances of the hull rupture were "unanticipated" within the meaning of section 1321, we also hold that they were not. The frequency of freshet conditions on the Hudson and the danger that they cause are well known to those who navigate the river. We read the tight language of the conference committee report as clearly indicating that Congress did not mean to allow recovery for spills resulting from events as regular and predictable as freshets.

■ Plaintiff argues, however, that, anticipatable or not, it still could not have avoided the accident without suspending its operations, and that Congress could not have intended that shippers stop using the Hudson whenever there is danger from freshets. We think this overstates the burden that section 1321 imposes. If shippers have established a general practice not to interrupt normal navigation during freshets and, presumably, to absorb in their operating costs any damage to their ships from freshet-related incidents, then it does not seem harsh for Congress to require shippers also to absorb the costs of cleaning up any oil that is spilled when those accidents occur. It would be inconsistent with the strictness with which the conference committee recommended that "unanticipated" for the purposes of section 1321 be read, to allow the section to cover regular and frequent conditions, like freshets, where the dangers are expected and where the losses are normally worked into the cost of doing business.

■ Plaintiff's final argument is that it is wrong to construe the "act of God" exception narrowly. The contentions basically are: (1) that a strict reading would discourage spillers from making cleanups themselves and (2) that the exception is remedial and thus should be broadly construed. Both of these arguments are answered by reading section 1321 as a whole. As pointed out in part I of this opinion, the section places the primary responsibility for oil spill cleanup on the President. Spillers may clean up their own spills, of course, but the section specifically does not rely on their doing so. The general conception of the section is that the Government will perform the cleanup operations and recoup its costs from the spillers, subject to certain liability exceptions. The inclusion of those exceptions in section 1321(i) is not encouragement to spillers to clean up their spills themselves but only a way to keep constant the allocation of the cost. Spillers who clean up may recover costs from the Government in just those situations in which the Government would have had to have borne the costs itself. Since the liability of the spiller does remain constant, irrespective of who actually makes the cleanup, there can be no special inducement in section 1321(i) for the spiller to do so. As also pointed out in part I, the entire history of section 1321 shows Congress's desire for a comprehensive solution to the oil spill problem. It is section 1321 that is remedial and

---

**5.** "[A] sudden calamitous event bringing great damage, loss, or destruction; *broadly*: a sudden or great misfortune

"*syn* DISASTER, CALAMITY, CATASTROPHE, CATACLYSM *shared meaning element*: an event or situation that is regarded as a terrible misfortune" [Webster's New Collegiate Dictionary (1973).]

not any of the exceptions to it. It is section 1321 as a whole that should be construed liberally.

Accordingly, we hold that the circumstances found to surround plaintiff's oil spill were not "an act of God" within the meaning of 33 U.S.C. § 1321(i)(1)(A) and that plaintiff is not eligible under that section to recover its cleanup costs from the Government. The determination of the trial judge is reversed and plaintiff's petition is dismissed.