**APEX OIL COMPANY, INC.**

v.

**UNITED STATES of America.**

No. Civ.A. 01-CV-0768.

United States District Court,
E.D. Louisiana.

Jan. 28, 2002.

Antonio J. Rodriguez, Fowler, Rodriguez & Chalos, New Orleans, LA, for Apex Oil Company Inc, dba Apex Towing Company, plaintiff.

Scott A. Memmott, Chris P. Reilly, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, John Robert Halliburton, U.S. Attorney's Office, Shreveport, LA, for United States of America, defendant.

National Pollution Funds Center, The, defendant.

## ORDER AND REASONS

ENGELHARDT, District Judge.

Plaintiff, Apex Oil Company, Inc., d/b/a Apex Towing Company (Apex), filed this suit appealing the denial of its claim for reimbursement of oil spill clean up costs under the Oil Pollution Act of 1990 (OPA), 33 U.S.C. §§ 2703, 2708(a)(1), as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The matter is presently before this Court on cross-motions for summary judgment filed by Apex and the United States of America (the Government). After careful review of the parties' submissions, the undisputed material facts, and the applicable law, the

Court DENIES Apex's Motion for Summary Judgment, GRANTS the United States' Motion for Summary Judgment and AFFIRMS the National Pollution Fund Center's (the Fund's) determination that Apex failed to carry its burden of proof with respect to the "act of God" defense. For the following reasons the plaintiff's case is dismissed with prejudice.

## 1. Undisputed Facts and Procedural Background

This case arises out of the June 16, 1995 allision of Apex barges towed by the M/V SONDRA B (a 3800 HP pushboat operated by Apex), and the Vicksburg Highway 80 Bridge at mile marker 435.7, which resulted in the discharge of slurry oil into the Lower Mississippi River (LMR) by two of the barges. The voyage commenced on June 8, 1995, when SONDRA B departed Corpus Christi, Texas. At the time of the allision the M/V SONDRA B was transiting northbound (toward Chicago) with seven barges in tow. The port side of the tow consisted of four barges (three loaded with slurry oil), the starboard side was made up of the three empties, with only a single port side barge faced up to the pushboat SONDRA B.

As the SONDRA B approached the bridge it began experiencing the strong, six-to-eight knot current due to the combined effects of the height of the river (47 feet/flood stage), and the sharp bend in the river just north of the bridge. Despite the magnitude of the current, the captain of the tug chose to proceed upriver past the bridge at mile marker 435.7 LMR. However, the captain opted to transit through an auxiliary span and a lesser current instead of the main span/midstream. Once the two most forward barges cleared the auxiliary span the current overwhelmed the tow, negating all forward movement—the SONDRA B completely stalled. Absent any forward momentum, the current pushed the entire tow to the right onto the concrete

bridge spans. The two aft barges allided with spans on their port sides causing the face wires holding the forward four barges to part. Five of the seven barges broke free, Apex Barge 3603 capsized and Barge 3506 sustained extensive hull damage on its port side. Both 3603 and 3506 began discharging slurry oil; approximately 840,000 gallons of slurry oil were discharged into the LMR.

Apex accepted responsibility for the discharge, funded removal activities, and reimbursed the Oil Spill Liability Trust Fund for the costs incurred by the Coast Guard in monitoring the removal operations and by the Navy personnel in conducting salvage operations. On June 15, 1998, Apex submitted a claim to the NPFC for reimbursement of its removal costs and salvage activities in the full sum of $2.7 million pursuant to § 2708(a)(1), claiming entitlement to the "act of God" defense. See Administrative Record [hereafter Admin.Rec.] at A(1)–(2).

Apex claimed that the flood of 1995 and exceptionally strong and unpredictable currents in the Vicksburg area of the LMR constituted an unanticipated grave natural disaster or other natural phenomenon, unavoidable even with the exercise of due care and foresight. Apex supported its position by submitting the Coast Guard's Marine Casualty Investigation Report (MCIR), which reached a conclusion that there was no negligence on the part of the pushboat captain and that a prudent mariner could not have foreseen the situation. [Admin.Rec. at A(7)].

The MCIR does not begin to address the issues with which the NPFC had to grapple pursuant to the OPA, to wit: (1) the issue of the corporate liability of Apex; (2) whether a different decision made at the corporate level in light of facts then known would have had the effect of avoiding such an incident; (3) whether *any* con-

duct on the part of corporate Apex contributed to the spill; or (4) whether the sole cause of the incident was an "act of God" within the meaning of the Oil Pollution Act of 1990 (OPA), 33 U.S.C. §§ 2701(1), 2703, 2708(a)(1).

The MCIR provides the following factual information *via* supplemental narrative dated January 23, 1996 concerning the Apex tow/bridge allision of June 16, 1995; to wit:

> The tow was arranged so that six barges were attached to the front of the tow, and only a single port side barge was faced up to the SONDRA B.
>
> \* \* \* \* \* \*
>
> As Captain Michael Bailey ... approached the bridge, he decided to transit through the auxiliary span instead of the main one due to the strong current at that point in the river. A high river (approximately 47 ft) in addition to the bend just north of the bridge created exceedingly strong currents in the vicinity of the bridge (estimated to be about 6 to 8 knots).

Apex also submitted the affidavits of its executive vice-president/general manager and its port captain to the NPFC claims manager in support of the claim for reimbursement. [Admin.Rec. at A(5)–(6)]. *Via* affidavit testimony, Apex representatives admitted that, prior to the incident on June 16, 1995, they were aware that the river was at flood stage. The survey of Lamy J. Chopin (civil engineer and surveyor), also submitted in support of Apex's claim for recovery costs, concluded that the 1995 flood of the Mississippi River was extreme at Vicksburg, creating exceedingly strong current velocity and inconsistent, unpredictable current patterns in the vicinity of mile marker 435.7 LMR. [Admin.Rec. at A(4)].

■ On July 1, 1998, the NPFC Claim's Division rejected Apex's claim that an "act of God" was solely responsible for the release of slurry oil. The NPFC cited a number of reasons for denying Apex's claim for recovery costs, concluding that human influence (Apex's decisions) played some part in the June 16, 1995 Vicksburg RR/Highway 80 Bridge allision. The NPFC Claim's Manager observed that:

> Because the Captain of the SONDRA B was aware that the current on the river was strong and that the water was high, it appears that he took a knowledgeable risk in proceeding, which led to the unfortunate event. Therefore, based on the information presented, Apex has not met its burden of demonstrating a defense to its liability and the claim is denied.

[Admin.Rec. at E]. On reconsideration, the NPFC claim's manager commented that the conclusion of "no negligence" in the MCIR [1] submitted by Apex was unavailing and not persuasive in light of the undisputed facts. *Id.*

In its March 3, 2000 determination, the final agency action pursuant to 33 C.F.R. § 136.115(d), the NPFC Claims Division again denied Apex's claim for recovery costs and, in connection with its denial, issued a nine-page legal analysis rejecting the "act of God" defense. The factual background supporting the NPFC's final decision highlighted the following particulars: (1) SONDRA B's 7–barge tow was ar-

---

1. The Coast Guard Marine Casualty Investigation Report (MCIR) which plaintiff submitted to the NPFC on reconsideration was prepared in connection with the initial Coast Guard investigation of the subject allision pursuant to 46 U.S.C. § 6301. The statutory scheme is merely investigatory and only empowers the Secretary to recommend further civil or criminal action. Conclusions emanating from the Marine Board inquiry fix no legal rights and impose no obligations, even if further proceedings prompted by MCIR conclusions may. See *Veldhoen v. U.S. Coast Guard.*, 35 F.3d 222, 225 (5th Cir.1994).

ranged such that six barges were attached in pairs to the front of the tow, was faced-up to the SONDRA B by a single port side barge with all loaded barges on the port side; (2) the July 7, 1995 and June 14, 1995 editions of the U.S. Coast Guard Notices to Mariners, advised that rises and falls could result in damage to navigational aids, that Aids to Navigation System could be compromised, and warranted due caution transiting all areas, since effects were being felt down river; and (3) the tug was underpowered for the job.[2]

NPFC's final decision rejected Apex's act of God defense utilizing the appropriate standard ("preponderance of the evidence"). The tenor and language employed in the analysis indicates in no uncertain terms that liability was *not* a close call at all. The analysis focused on the following pertinent factors, to wit: (1) whether the circumstances constituted an unanticipated, grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character; (2) whether the effects of the natural phenomenon could have been prevented by the exercise of due diligence and foresight; and (3) whether grave natural disaster or other natural phenomenon was the sole cause of the discharge.[3] In the final analysis, Apex failed all three inquiries.

The NPFC claim's manager explained as to the first prong of the detailed analysis (foreseeability), that Apex could have anticipated that spring floods in the Midwest would result high river stages on the

Mississippi River in the Vicksburg area and that strong currents associated with flood stage are not unusual and can be anticipated. Indeed, "the tug's captain, in anticipation of strong current velocities, chose to transit the bridge spans on the outer bend of the river, where the current velocities could be slower." [4]

The analysis highlights that the flood conditions and associated strong currents moving downstream to the Lower Mississippi River were anticipated, predicted, widely covered in the media, and the subject of a general advisory in the Notices to Mariners. The Agency concluded, on the basis of historical data and current information available concerning the Mississippi's flood stages and currents, that it was foreseeable that the tug and barges, transiting upriver into increasingly higher and faster waters, would encounter strong, unpredictable currents which could pose significant navigational problems. Based on that analysis, the NPFC's director found that Apex could have prevented or avoided the effects of the LMR at flood stage and associated predictably strong currents by investing in a higher-powered tug that could safely maneuver the strong currents predicted and in fact encountered by the SONDRA B en route to Chicago. Assuming *arguendo* that the flood and strong associated currents were an act of God, the NPFC director concluded that Apex was not entitled to recover, because it failed to show that the situation was caused entirely

---

**2.** The MCIR description details under casualty prologue states that: "Transiting N/B on the LMR, 435 miles AHOP, the M/V SONDRA B. & tow of 7 barges 'stalled' (lost forward momentum) and allided with the Vicksburg Hwy. 80 Bridge." [Admin.Rec. at A(7)]. The number one casualty event sequence was "loss of vessel control/propulsion." *Id.* The MCIR Marine Casualty Narrative notes that Captain Bailey doubted his ability to transit the main span due to the strong current, but

nevertheless opted to proceed through an auxiliary span presumably with a lesser current. *Id.* The Court here notes that the MCIR does not state that the "tug was underpowered for the job," however the narrative and facts set forth in the report hardly obviate that conclusion reached by the NPFC.

**3.** [Admin.Rec., Exhibit E at p. 4].

**4.** [Admin.Rec., Exhibit E at p. 5].

by an act of God. In this vein, the NPFC decision observed that:

> Apex chose not to interrupt its normal navigation in the face of floods, which they admit they knew about. Further, Apex chose to transit the flotilla into this riskier environment with an underpowered tug to tow the barges. This underpowered tug was the proximate cause of the discharge of oil. . . .
>
> The facts reflect that the Apex decision to navigate into higher and faster waters with an under powered tug contributed to the discharge.[5]

In its final decision on reconsideration, the NPFC Director explained that liability under both OPA and its predecessor, FWPCA, is a strict liability scheme. The lack of negligence in navigating the tug then is not a consideration, and instead the focus remains whether conduct of the owners and operators contributed to the accident in any way. The claims manager concluded: "Notwithstanding that Apex's decision to navigate into an increasingly riskier environment with an inadequately powered tug may not have been negligent does not mitigate Apex's strict liability for removal costs and damages because Apex's decisions contributed to the incident." [6]

The NPFC's final analysis commented specifically that the initial denial letter did not create an impossible standard. The standard that Apex failed to meet was that it could and did not prove that the sole cause of the incident was an act of God. The NPFC Director further explained that the loose language in the first denial letter stating that an accident must be "entirely absent of human agency" meant no more that the act of God must be the *sole* cause of the discharge. On reconsideration, the NPFC disagreed with claimant's argument that it abused its discretion by creating an arbitrary and impossible standard.

## 2. The Oil Pollution Act

The Oil Pollution Act, 33 U.S.C. § 2701–61 ("OPA"), provides that:

> . . . each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon navigable waters or adjoining shorelines . . . is liable for the removal costs . . . that result from such incident.

33 U.S.C. § 2702(a). The OPA allows Apex the right to seek reimbursement from the Oil Spill Liability Trust Fund for the removal costs and damages incurred. Whereas here, the NPFC has denied the claim and the agency decision has been deemed final, judicial review is available pursuant to the Administrative Procedures Act (5 U.S.C. §§ 701–706), which provides for judicial review of final agency action for which there is no other adequate remedy. [7] 5 U.S.C. § 704. Because there is no adequate remedy, the APA's waiver of sovereign immunity provides the jurisdictional basis for Apex's suit against the United States seeking review of the NPFC's decision denying its claim for reimbursement of recovery costs and cleanup expenses. [8]

## 3. Standard of Judicial Review.

In the absence of a statutory review standard, the Court must look to the standard established by the Administrative

---

5. [Admin.Rec., Exhibit E at p. 7].

6. *Id.* at p. 8.

7. Section 2715 authorizes the Attorney General to bring suit on behalf of the Fund to recover money paid on OPA claims, however there is no authority providing for judicial review of claims against the Fund. See *International Marine Carriers v. Oil Spill Liability Trust Fund,* 903 F.Supp. 1097, 1101 (S.D.Tex. 1994).

8. *Id.*

Procedures Act (APA). See *Sierra Club v. Glickman,* 67 F.3d 90, 96 (5th Cir.1995). Agency actions may be set aside only if the agency action, findings, and conclusions are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, limitations, or short of statutory right; or without observance of procedure required by law. See 5 U.S.C. § 706.

■ In reviewing administrative action taken pursuant to a regulation issued to interpret and implement a federal statute, the deference to be accorded the action is dictated by whether the regulation at issue is "legislative" or "interpretive" in nature. Where the regulation is legislative, that is, issued under a specific grant of authority to prescribe a method of executing a statutory provision, the court may set aside the agency action only if the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action otherwise failed to meet statutory constitutional, or procedural requirements.[9]

Regulations at issue in this case were promulgated pursuant to specific statutory authority (the OPA), which authorizes the NPFC to make rules, regulations and decisions in enforcing the OPA. This Court may therefore set aside the decision of the NPFC only if its decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if the action otherwise failed to meet statutory constitutional, or procedural requirements.

■ A reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of authority delegated to the agency. See *Motor Vehicle Manufacturers Association v. State Farm Mu-*

*tual,* 463 U.S. 29, 45, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The Supreme Court further observed:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." ... We will ... "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned."
> ... [I]t is also relevant that Congress required a record of the rulemaking proceedings to be compiled and submitted to a reviewing court, 15 U.S.C. § 1394, and intended that agency findings under the Act would be supported by "substantial evidence on the record considered as a whole."

*Motor Vehicle Manufacturers,* 103 S.Ct. at 2866–2867.

■ While the reviewing court must make a careful and searching inquiry into the facts, it may not substitute its own judgment for that of the agency. The agency's decision need not be ideal, as long as it is not arbitrary and capricious, such that the agency gave at least the minimal consideration to the relevant facts contained in the record. See *Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 327 (5th Cir.1988) (A court may not re-weigh the evidence but must determine whether the agency's decision "was based on a consideration of

**9.** See *Fort Hood Barbers Association v. Herman, Secretary of Labor,* 137 F.3d 302, 307 (5th Cir.1998) (citing *Citizens to Preserve Over-* *ton Park Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971)).

the relevant factors and there was a clear error of judgment.").

The case is before this Court on cross-motions for summary judgment, each party contending that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. This case turns in large part on the legal meaning of the term "act of God" pursuant to defining language in the OPA. Apex is admittedly the "responsible party" within the meaning of the OPA. One of the questions posed to this Court is whether the NPFC's finding that the conduct of Apex contributed to the spill is supported by substantial evidence of record. Stated another way, the issue is whether the NPFC's finding that Apex failed to carry its burden of proving by a preponderance of the evidence that an "act of God" *solely* caused the release of slurry oil, is arbitrary and capricious.

 The Court's review of the NPFC's interpretation of OPA's provisions, however is plenary. The interpretation may not be accepted if it is "contrary to Congress's intentions as revealed by the Act's language, structure and legislative history." *Exxon Corp. v. Train,* 554 F.2d 1310, 1322 (5th Cir.1977). However, if Congressional intention is not pellucid, some deference is accorded to the agency's interpretation of the statute entrusted to it for purposes of enforcement. See *Environmental Protection Agency v. National Crushed Stone Association,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980). If the statute is susceptible to more than one interpretation, the Court must accept that of the agency if it is reasonable. See *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 844, 104 S.Ct., 2778, 2782, 81 L.Ed.2d 694 (1984); see also *United States v. Ethyl Corp.,* 761 F.2d 1153, 1157 (5th

Cir.1985), *cert. denied,* 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986). The Court need not find that it is the only permissible interpretation, but merely that the agency's understanding of the statute is sufficiently rational to preclude a court from substituting its judgment for that of the agency.[10]

It is within the confines of the standards discussed above that the Court must consider the summary judgment motions now presented. Summary judgment is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56. A fact is material if its resolution in favor of one party might affect the outcome of the suit under the governing law. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not be granted if the evidence indicates that a reasonable fact finder could have found in favor of the non-moving party. *Id.* The role of summary judgment is to pierce the pleadings and to assess the proof to determine whether there is a genuine need for trial.

### 4. Analysis

Apex contends that NPFC's decision must be set aside because it improperly defined the term "act of God" within the meaning of the OPA and imposed an inappropriate standard (beyond a preponderance of the evidence). Essentially, Apex argues that NPFC was arbitrary and capricious in failing to find under the facts that the flood stage precipitated strong currents encountered by the SONDRA B transiting the northbound on the Mississippi River at mile marker 435.7 LMR constituted the sole cause of the oil spill on

---

**10.** See *Chemical Manufacturers Association v. NRDC,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985).

June 16, 1995. Additionally, Apex argues that the NPFC's imposition of an impossible standard (*i.e.*, the complete absence of human agency contributing to the spill), constitutes an abuse of discretion. Apex suggests that the NPFC imposed the wrong standard since, in the final analysis, the claim's manager utilized the term "beyond" instead of "by" in conjunction with the applicable preponderance of the evidence standard.

For its part, the Government contends that: (1) it is clear that Apex failed it meet its burden of proof with respect to the "act of God" defense in a number of particulars; (2) Apex overemphasized the conclusion contained in the Coast Guard's investigative casualty report regarding the finding of "no negligence" on the part of the tug captain and crew and that the MCIR is "irrelevant" as a matter of law; and (3) the decision was not arbitrary and capricious, particularly in light of the agency's comprehensive analysis on reconsideration addressing anew each and every issue raised by Apex's request for reconsideration in light of the whole administrative record. Alternatively, the United States submits that if the agency's decision is not sustainable on the basis of the administrative record, the matter should be remanded for further consideration in light of the correct standard.

The Oil Pollution Act of 1990 (OPA), signed into law by President Bush on August 18, 1990, established a comprehensive Federal oil spill response and liability legislative framework and ushered in several landmark reforms. First of all, it strengthened measures for oil spill prevention, requiring oil tankers over 5,000 gross tons constructed after 1990 to have double hulls, and required the issuance of interim spill prevention rules applicable to single-hull vessels. Second, the OPA increased the financial consequences of oil spills by: (1) expanding the scope of polluter liability by imposing **strict liability for the clean-up costs** and resulting damages; (2) raising the liability limit for vessels, which limit could be superseded in the event of gross negligence, *inter alia,* on the part of a responsible party; (3) strengthening oil spill response capabilities and advance planning; and (4) facilitating access to funds to ensure prompt and complete recovery for damages arising from an oil spill.[11]

Congress explicitly recognized that the existing federal and state laws provided inadequate cleanup and damage remedies, required large taxpayer subsidies for costly cleanup activities, and presented substantial barriers to victims' recoveries such as legal defenses, corporate forms, and burdens of proof unfairly favoring those responsible for the spills. See S.Rep. No. 94, 101st Cong., 1st Sess. (1989); 1990 U.S.C.C.A.N. 722. Congress also recognized that, pre-OPA, the costs of cleanup and damage from spills were not high enough to encourage greater industry efforts to prevent spills and develop effective techniques to contain spills that did in fact occur. *Id.* **Congressional intention is manifestly that the new law would effect** compensation to victims, quick and efficient cleanup with minimization of damages to natural resources, and **the inter-**

---

**11.** The legislative history of OPA includes such statements as: "This new law, the Oil Pollution Act, is the latest in what I believe is an impressive record of significant marine environmental protection laws which have been developed in the Merchant Marine and Fisheries Committee and approved by this Congress." 7136 Cong.Rec. E3021–03 (Jones, W.). "The primary goal of this legislation is to prevent oil spills from occurring in the future. We must make every effort to ensure that accidents like the Exxon Valdez and the Mega Borg do not happen again and that our waterways are free from the ravages of oil." 9136 Cong.Rec. H6933–02 (Fields, J.).

nalization of the costs of oil spills within the oil industry. *Id.*

■■■ Liability under the OPA and CERCLA [12] is strict, and the absence of fault, or the exercise of due care is not a defense.[13] The OPA provides in no uncertain terms: "Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, or which poses a substantial threat of a discharge of oil, into or upon the navigable waters ..., is liable for the removal costs and damages...." 33 U.S.C. § 2702(a).

The OPA continues to rely on the Clean Water Act (CWA) [14] and adopted Section 311's standard for liability of dischargers for cleanup costs for the discharge of oil, including economic damages, removal costs and natural resource damages. See S.Rep. 101–94, 11; 1990 U.S.C.C.A.N. 722, 732–733 ("That standard of liability has been determined repeatedly to be strict, joint, and several liability."). Neither the language of the OPA nor its legislative history discussed above and below suggest that its provisions should be construed contrary to settled law applicable to the FWPCA/CWA when OPA was enacted.

The only defenses to strict liability under CERCLA and OPA are that removal costs were caused *solely* by (1) an act of God, (2) an act of war, or (3) a third party not in a contractual relationship with the responsible party. See 33 U.S.C. § 2703(a); 42 U.S.C. § 9607(b). The complete defense to strict liability prescribed by OPA, which Apex claims exonerates it in this case, is the "act of God" exception. Section 2703(a) of Title 33 provides in relevant part:

> A responsible party is not liable for removal costs or damages ... if the responsible party establishes, by a preponderance of the evidence, that the discharge ... of oil and the resulting damages or removal costs were caused solely by—
>
> (1) an act of God....

33 U.S.C. 2703(a)(1). For purposes of the OPA, the term "act of God" means "an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 33 U.S.C. 2701(1).[15]

Congressional intent is clearly that the "exceptional natural phenomenon" (*i.e.*, the "act of God") defense be construed as much more limited in scope than the tradi-

---

**12.** The United States can recover response costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607, where it establishes a *prima facie* showing that: (1) the site is a facility; (2) a release or threatened release of a hazardous substance occurred; (3) the government incurred costs in responding to the release or threatened release; and (4) the defendant is the liable party. See *United States v. Chapman*, 146 F.3d 1166, 1169 (9th Cir. 1998). A responsible party under OPA and CERCLA includes owners, operators, or demise charters of a vessel. See 33 U.S.C. § 2701(32); and 42 U.S.C. § 9607(a)(1).

**13.** See *In re Complaint of Metlife Capital Corp.*, 132 F.3d 818, 820–821 (1st Cir.1997)

(OPA is a strict liability statute); *State of Idaho v. Hanna Mining Co.*, 882 F.2d 392, 394 (9th Cir.1989) (CERCLA is a strict liability statute); 33 U.S.C. § 2702(a); 42 U.S.C. § 9607(a).

**14.** Prior to the OPA, the Federal Water Pollution Control Act ("FWPCA") (commonly known as the Clean Water Act (CWA)), 33 U.S.C. §§ 1251–1387, provided liability limitations for federal pollution removal costs associated with oil spills. *Id.* at § 1321(c).

**15.** A limitation on the complete defense, which does not apply in this case, would be in the failure or refusal of a responsible party to report the incident as required by law or fails to provide reasonable cooperation or assistance, *inter alia*. See 33 U.S.C. 2703(c).

tional common law "act of God" defense. The discharger's burden of proof on the defense of "exceptional natural phenomena" is much more onerous than that required for common law or traditional "act of God" defense. The legislative history of CERCLA includes the following explanation regarding the *singular* "defense for exceptional natural phenomena":

> The defense for the exceptional natural phenomenon is similar to, but more limited in scope than, the traditional 'act of God' defense. It has three elements: the natural phenomenon must be exceptional, inevitable, and irresistible. Proof of all three elements is required for successful assertion of the defense. The 'act of God' defense is more nebulous, and many occurrences asserted as 'acts of God' would not qualify as 'exceptional natural phenomenon.' For example, a major hurricane may be an 'act of God,' but in an area (and at a time) where a hurricane should not be unexpected, it would not qualify as a 'phenomenon of exceptional character.'

H.R.Rep. 99–253(IV), 1986 U.S.C.C.A.N. 3068, 3100.

The close analogy to the OPA found in cost recovery actions under section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, and section 7003(a) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973(a) cannot be ignored. CERCLA section 107 and RCRA section 7003(a), like OPA section 2712, provide for reimbursement of costs incurred from remediation of a discharge or response to a threat of discharge. Courts recognize that CERCLA actions for recovery of response costs and RCRA actions for recovery of abatement costs are actions for equitable relief (equitable claims for restitution/reimbursement of funds expended to respond to health and environmental danger posed by hazardous substances).[16] Section 101(1) of CERCLA identically defines the term "act of God" as "an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 42 U.S.C. § 9601(1).[17]

Apex has failed to cite one case which supports its interpretation of OPA's "act of God" defense as setting forth the tortured bifurcated standard it foists upon the language, emasculating its most salient theme—strict liability for the responsible party. By its plain terms and even dis-

---

**16.** See *International Marine Carriers v. Oil Spill Liability Trust Fund,* 903 F.Supp. 1097, 1102 (S.D.Tex.1994); *Mustang Tractor & Equipment Co. v. Liberty Mutual Insurance Co.,* 1993 WL 566032 (S.D.Tex. October 8, 1993).

**17.** See *United States v. Barrier Industries, Inc.,* 991 F.Supp. 678 (S.D.N.Y.1998) (spills of hazardous substances caused by bursting pipes following unprecedented cold spell not an "act of God" within the meaning of CERCLA so as to absolve principal of bankrupt corporate owner of waste site from liability for response costs given other factors antedating cold weather which contributed to the spills); *United States v. M/V SANTA CLARA I,* 887 F.Supp. 825 (D.S.C.1995) ("loss of containers of arsenic trioxide overboard resulting from storm not 'act of God' within the meaning CERCLA where weather predicted by weather service was known to captain and crew prior to their departure, and in light of bad weather crew was directed to take extra precautions to insure vessel and cargo were secure for rough seas"); and *United States v. Stringfellow,* 661 F.Supp. 1053 (C.D.Cal.1987) (heavy rainfall not an exceptional natural phenomenon within the meaning of CERCLA's "act of God" defense to payment of response cost incurred as a result of release of hazardous waste from toxic waste disposal site, where rains were foreseeable based on normal climactic conditions, and where harm caused by rain could have been averted by properly designed drainage canals).

counting the term "grave," the "natural disaster or other natural phenomenon" must be "of be of an exceptional, inevitable, and irresistible character the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 33 U.S.C. § 2701(1).

Although there have been few, if any, cases construing the OPA definition of "act of God," there is a substantial body of law interpreting that term pursuant to the CWA, 33 U.S.C. § 1251 and CERCLA, 42 U.S.C. § 9607. The legislative history of OPA admits that it amended, expanded, and strengthened pre-existing statutes that addressed oil spill cleanup, liability and compensation. The body of law already established under Section 311 of the CWA is the foundation of the OPA. Many of that section's concepts and provisions are adopted directly or by reference.[18]

As to coverages and definitions, the Senate Report specifically provides that:

> The Oil Pollution Liability and Compensation Act of 1989 continues to rely on Section 311 of the Clean Water Act as the basic law providing for cleanup authority, for penalties for spills and failure to notify of spills, and, by adopting the standard of liability under section 311 as the standard of liability under this Act [OPA]. That standard of liability has been repeatedly determined to be strict, joint, and several liability. This bill adopts these standards for economic damages, as well as for removal costs and natural resource damages.[19]

■ The legislative history of the OPA, the textually similar definition "act of God" in the CWA, the textually identical definition in CERCLA, considered together with the fact OPA was intended to expand that liability of the discharger, strongly militates in favor of finding that Congress intended to establish a uniformly and *singularly* limited "act of God" defense. "These defenses are narrowly construed, and only in the situation where the discharge was totally beyond the control of the discharging vessel would the responsible party be excused from liability." *United States v. English*, 2001 WL 940946 (D.Hawai'i) (citing *Reliance Ins. Co. v. United States*, 230 Ct.Cl. 390, 677 F.2d 844, 849 (1982)).

■ Essentially, Apex asks this Court to broadly construe the "act of God" defense in favor of the discharger so as to diminish its liability under the OPA. The Court is not inclined to depart from the clear literal and historical meaning of such a defense.

In the first place there is no rational basis for distinguishing between a "natural disaster" and a "natural phenomena." The terms are "interchangeable" and have been so construed by cases interpreting identical language under related statutes. As for the rest of the definition, "grave", "unanticipated", "irresistible", and the like, CERCLA and CWA jurisprudence control. Suffice it to say, in light of the legislative history and apparent Congressional intent, the OPA's "act of God" defense should be read to be at least as restrictive in its scope as it is under both the CWA and CERCLA cases discussed below

In *United States v. Alcan Aluminum Corp.*, 892 F.Supp. 648 (M.D.Pa.1995), the Government brought an action under CERCLA against an aluminum manufacturer to recover response costs. The district court granted summary judgment finding that Alcan presented neither evidence nor argument that its emulsion was environmentally benign. *Id.* at 655. The

---

18. See S.Rep. No. 101–94, 101st Cong., 2d Sess., reprinted in 1990 U.S.Code Cong. & Admin.News 722, 723–724. *Id.* at 726.

19. *Id.* at 732.

court rejected Alcan's argument regarding divisibility of the harm because it failed to present facts sufficient to present a triable issue on the apportionment of liability. *Id.* at 657. Addressing the "act of God" defense (specifically Hurricane Gloria), the court easily dismissed Alcan's argument that the release of toxic substance occurred in connection with the torrential downpour of rain associated with that hurricane.

The *Alcan Aluminum* court was faced with the identical definition of "act of God," albeit within the context of CERCLA, to wit: " 'an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight.' " *Id.* at 658 (citing 42 U.S.C. § 9601(1)). Alcan's argument was twofold: (1) the hurricane was "a grave natural disaster or phenomenon"; and (2) it was unanticipated as far north and inland as Pennsylvania. The court noted that there were three independent reasons warranting the rejection of the defense, to wit: (1) no reasonable fact finder could conclude that Hurricane Gloria was the *sole* cause of the release since Alcan's earlier conduct (unlawful disposal) played a part in flushing the chemical soup into the Susquehanna River; (2) the effects of Hurricane Gloria could have been prevented by not dumping hazardous waste into mine workings in the first place; and (3) heavy rainfall was not the kind of natural phenomenon to which the exception applied. 892 F.Supp. at 658.

The court in *United States v. Stringfellow*, 661 F.Supp. 1053 (C.D.Cal.1987) (a CWA/CERCLA case),[20] referring to CERCLA's section 107(b) "act of God" defense, held that the polluters must show that the release of hazardous substances was caused "solely by an 'act of God.' " The district court granted the plaintiffs' motion with respect to partial summary judgment rejecting that defense. It is noteworthy that in dismissing the claimed defense, the district court utilized the terms "natural disaster" and "exceptional natural phenomenon" interchangeably, as follows:

> The defendants contend that the heavy rainfall in 1969 and 1979 was a **natural disaster** which constituted an act of God. However, the Court finds that the rains were not the kind of **"exceptional" natural phenomenon** to which the narrow act of God defense of section 107(b)(1) applies. The rains were **foreseeable** based on normal climactic conditions and any **harm** caused by the rain **could have been prevented** through the design of proper drainage channels. Furthermore, the **rains were *not the sole cause*** of the release. Therefore, the Court concludes that the rains were not sufficient to establish an act of God defense pursuant to CERCLA section 107(b)(1).[21]

*Id.* at 1061 (emphasis added).

The case *United States v. J.R. Nelson Vessel, Ltd.*, involved an action by the United States seeking recovery of costs incurred by it in cleaning up an oil spill resulting from the damage to a vessel pur-

---

**20.** In *Stringfellow*, plaintiffs sought to recover the costs of remediation from the owners and operators of the toxic waste facility (the Stringfellow disposal site) pursuant to CERCLA, 42 U.S.C. §§ 9601–9657 and the Federal Water Pollution Control Act (the Clean Water Act (CWA)), 33 U.S.C. §§ 1251–1376, *inter alia.* 661 F.Supp. at 1059.

**21.** As previously stated CERCLA's definition of "act of God" is identical to that provided by the OPA—"an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 42 U.S.C. § 9601(1) (CERCLA); 33 U.S.C. 2701(1) (OPA).

suant to the OPA, and further seeking declaratory judgment that the owner was responsible for removal of the vessel from the harbor where it was stored. The F/V J.R. NELSON, a 112.7 foot, 276 gross ton fishing vessel, was owned and operated by the J.R. Nelson, Ltd. On December 13, 1992, the NELSON partially sank and leaked oil while moored in Greenport Harbor, New York, at a pier owned by Greenport Yacht and Shipbuilding Company, Inc. Cleanup efforts resulted in the recovery of approximately 500 gallons of oil from inside the sunken vessel and the surrounding waters. Likening the OPA's "act of God" defense to CERCLA's, the district court held that although much was made of the severity of the storm, the defendants failed to establish that the storm was of sufficient magnitude to invoke the defense, which applied only in the case of " 'an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable and irresistible character . . .' " 1 F.Supp.2d 172, 176 n. 2 (E.D.N.Y. 1998) (citing 33 U.S.C. § 2701(1)).

In *United States v. Barrier Industries, Inc.*, construing the term "act of God" under CERCLA, the district court rejected the defendant's claim that the January, 1994 unprecedented cold spells which caused the bursting pipes even remotely fell within CERCLA's definition of "act of God." 991 F.Supp. 678, 679 (S.D.N.Y.1998). The court emphasized that by its terms, the defense of act of God pertains "only if the release or threatened release of hazardous substances is caused **'solely'** by the **act of God**." *Id.* (emphasis added). The district court observed that numerous other factors antedating the cold weather of January, 1994 causally contributed to the problems.

In construing the statutory "act of God" defense, this Court must be guided by the provisions of the law as a whole, its object and policy. The legislative history is clear, and having had the opportunity to fully appreciate the arguments of both parties, the Government advances the most straightforward reading of the provisions, in context with the object and purpose of the statute, the legislative history, and consistent with parallel, if not identical, provisions of similar statutes that have the same object, policy, and legislative history. Moreover, the construction of the statutory scheme by the very same agency entrusted to administer it is entitled to considerable weight where it is a rational construction. See *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984).

The Government correctly observes that none of cases cited regarding the "act of God" defense mimic the undisputed facts presented in the case at bar. In all but one of the cases, the "act of God" came to the claimant.[22] Even so, in not one of the cases was the strictly liable polluter exonerated.

The case at bar indisputably involves Apex's undertaking the task of towing seven barges, three of which were laden with slurry oil, up the Mississippi River toward their final destination in Chicago, knowing the flood stage condition of the river, knowing that strong fast currents were precipitating damage to navigational aids, knowing that effects were migrating down

---

**22.** See *Liberian Poplar Transports, Inc. v. United States*, 26 Cl.Ct. 223, 225–226 (1992) (ship moored at pier during severe thunderstorm); *Kyoei Kaiun Kaisha, Ltd. v. M/V BERING TRADER*, 795 F.Supp. 1054, 1056 n. 2 (W.D.Wa.1991) (storm caused grounding of vessel at anchor); *St. Paul Fire & Marine Ins. Co. v. United States*, 4 Cl.Ct. 762 (Ct.Cl.1984) (soil settlement caused storage tank to rupture); *Stringfellow*, 661 F.Supp. at 1061 (heavy rainfall caused release at storage facility); and *Alcan Aluminum Corp.*, 892 F.Supp. at 651 n. 1 (hurricane caused release at storage facility).

river, after being duly advised that caution should be exercised in light of the considerably perilous conditions. Not only did Apex proceed, fully advised of these conditions, to ship three barges laden with slurry oil together with four empties northbound, but it did so with a tug which did not have an engine powerful enough to press onward into the increasing swift and powerful current on the river rife with tortuous bends.

The Court agrees with counsel for the Government that this case presents a situation most closely analogous to that discussed in *Sabine Towing & Transportation Co., Inc. v. United States,* 229 Ct.Cl. 265, 666 F.2d 561 (1981) (FWPCA/CWA case), involving a vessel transiting the Hudson River in freshet [23] conditions occasioned by spring run-off. Plaintiffs vessel T/S COLORADO struck an unknown underwater object in the Hudson River channel bound for New York with a cargo of petroleum products. The COLORADO was opposite Roger's Island at the time the hull was ruptured, but there was no release or significant spillage until the raptured tank was opened for discharging at Resselaer when approximately 30,000 to 50,000 gallons spilled into the Hudson River.

The *Sabine Towing* court rejected the plaintiffs "act of God" defense, noting that the conference committee notes make it clear that an "act of God" must result *solely* from a grave natural disaster, and be unanticipated. Certainly if freshet conditions do not constitute an "act of God" within the meaning of the CWA, then a swift unpredictable current on the Mississippi River at or about the time of heavy rains caused the Mississippi River to rise to flood stage can not constitute an "act of God" within the meaning of the OPA.

Indeed, in the wake of the 11 million gallon spill from the Exxon Valdez in Alaska's Prince William Sound, the OPA amended the FWPCA/CWA to require federal removal of oil spills and federal approval of oil spill response plans, provided expanded cleanup and oversight responsibilities of the federal government, and increased the potential liabilities of responsible parties, significantly broadening their financial responsibility requirements.[24] Apex's argument that the OPA's "act of God" defense is somehow more favorable to a responsible party flies in the face of its legislative history as well as the object and purpose of the statute.

The conditions of the river which occasioned the discharge of slurry oil at issue in this case were both anticipated and predicted. The most apparent cause was the underpowered Apex tug, which was stalled by even the less powerful current encountered transiting an auxiliary span of the Highway 80, Vicksburg Bridge on the LMR. The second most apparent cause is that, in the face of the intensifying current in close proximity to the bridge and just below a sharp bend in the river, the tug captain chose to negotiate the bridge with his tug and tow, albeit through an auxiliary span where he believed the current to be of a lesser force or magnitude.

It cannot be seriously argued that the preliminary conclusions of the Marine Board set forth in the Marine Casualty Investigation Report (MCIR), while part of the administrative record, should com-

---

**23.** The court explained that the freshet conditions consisted of an increased rate of flow and were due to the rain and the spring runoff of melted snow, which not only raises the level of the river, but also causes the wash down of sediment, gravel, logs, rocks and other debris into the river. *Sabine Towing,* 666 F.2d at 563.

**24.** See S.Rep. No. 101–94, 101st Cong., 2d Sess., reprinted in 1990 U.S.Code Cong. & Admin.News 723, 724, 729.

prise the beginning and end of NPFC's inquiry with respect to Apex's claim for recovery costs in this matter. The NPFC adjudicates claims against the Fund in accordance with the OPA and claims procedures set forth at 33 C.F.R. Part 136.1 *et seq.*

▇▇▇▇ Apex's suit seeking review of the denial of its claim against the Government for recovery costs in this case, is limited by the framework of the Administrative Procedures Act (APA). See 5 U.S.C. § 702. The APA permits "non-statutory" judicial review only of "final agency action." 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no adequate remedy in a court are subject to judicial review."). A final agency action is one that imposes an obligation, denies a right, or fixes a legal relationship.[25] Initiation of an investigation does not constitute final agency action.[26] Generally, the plaintiff must await resolution of the agency's inquiry to challenge the final agency decision. Any suggestion that the MCIR constitutes a complete investigation and somehow stops the NPFC's adjudication denying its claim is meritless. The statutory scheme that Apex seeks to place at issue is merely investigatory, and simply empowers the Secretary to recommend further civil or criminal action. See 46 U.S.C. § 6301. It is the NPFC's conclusions and final decision that fixed Apex legal rights or lack thereof.

Moreover, according to the plain language of the statute, the Coast Guard accident report is not admissible evidence either in the instant case or in an administrative claims process instituted by Apex seeking reimbursement for recovery costs.

*See Tokio Marine and Fire Insurance Co. Ltd. v. M/V FLORA,* 1998 WL 516110 (E.D.La.). According to section 6308, "no part of a report of a marine casualty investigation conducted under section 6301 ... including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceeding, other than an administrative proceedings initiated by the United States." 42 U.S.C. § 6308. The captioned proceedings were not initiated by the Government.

Defense counsel aptly points out that the reason that the MCIR is part of the administrative record in this case is simply because Apex submitted the document to the NPFC as evidence in the context of its administrative claim process. In its final analysis, the NPFC commented that counsel for Apex attempted to make too much of the conclusions and findings set forth in the MCIR. I agree.

Nevertheless, assuming without deciding that the MCIR is relevant, it supports the NPFC's conclusion that the tug was underpowered for the job. The agency's conclusion in that vein was not arbitrary and capricious and finds support in substantial evidence of record.

It is the undisputed facts which defeat Apex's claim since the "act of God" must be the *sole* cause, and the conduct of Apex may not be a factor contributing to the discharge. Analysis of the relevant documents requires some level of expertise and the Court must defer in the case of disputed facts to the informed discretion of the federal agency. Whenever a court reviews an agency decision or action under the

**25.** See *United States Department of Justice v. Federal Labor Relations Authority,* 727 F.2d 481, 493 (5th Cir.1984).

**26.** See *Dow Chemical v. EPA,* 832 F.2d 319, 325 (5th Cir.1987) ("allegation made in enforcement suit does not impose the kind of legal obligation with which the finality doctrine is concerned").

APA, some legal standard is always involved. Otherwise, there would be "no law to apply" and thus no basis for APA review.

■ Whether the NPFC utilized the appropriate standard is only half of the equation in this particular case. What Apex seeks is a determination that the NPFC's review was incomplete, inconclusive, or inaccurate. Apex has attempted to make much of the superficially conflicting assessment set forth in the MCIR and the NPFC's final decision denying reimbursement of recovery costs. It is clear that regardless of the fact of the existence of any marine casualty report, the NPFC was obligated to and did in fact did take a good hard look at the facts upon which the report was premised. The NPFC concluded, based upon careful analysis of the historical and scientific facts, that the conduct of Apex contributed to the release.

While discovery is a process meant to give the litigants the opportunity "to leave no stone unturned," this Court's review is limited to determining whether the NPFC director's final decision is either arbitrary and capricious and/or finds support in substantial evidence of record. Only evidence that was considered and made part of the administrative record is relevant. Whether NPFC's decision is supported by substantial evidence is determined on the basis of the administrative record considered as a whole. Apex has come forward with not a scintilla of evidence that the administrative record is incomplete. Indeed, Apex was afforded the opportunity to expand the record before the NPFC issued its final decision. When Apex requested reconsideration of the initial denial of its claim, it again proffered the inadmissible irrelevant MCIR, along with affidavits and the Lamy survey report.

As to the problem noted with the preponderance of the evidence standard, it is clear, viewing the record as a whole, that whether or not the word "beyond" was a merely a typographical error in the lengthy final analysis, the NPFC's decision admits only the conclusion that Apex failed to come close to meeting the standard (preponderance of the evidence). Remand would serve no useful purpose in this case. The Fund's determination that Apex failed to meet it burden with respect to proof of the "act of God" defense with the meaning of section 2703(a)(1) was not unreasonable.

### 5. Conclusion

The Court AFFIRMS the NPFC's determination rejecting the OPA section 2703 "act of God" defense claimed by Apex and denying its request for reimbursement of recovery costs. Accordingly,

IT IS ORDERED that the Apex's Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that the Government's Motion for Summary Judgment is GRANTED and the plaintiffs claims are DISMISSED WITH PREJUDICE.